Argued and submitted October 31, 1995, reversed and remanded for new trial
May 29, 1996

# STATE OF OREGON,
## *Respondent,*

*v.*

# ERIC JONATHAN RINKIN,
## *Appellant.*

## (CM94-20493; CA A85305)

917 P2d 1035

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

Deits, P. J., concurring in part; dissenting in part.

## HASELTON, J.

Defendant appeals his conviction for attempted sodomy in the first degree. ORS 161.405(1)[1]; ORS 163.405.[2] He assigns error to the trial court's denial of his motion for a judgment of acquittal and to the trial court's denial of his motion to exclude evidence of prior bad acts. OEC 404(3). We reverse the conviction and remand for a new trial.

In the light most favorable to the state, the evidence establishes the following facts: Defendant and the complainant, "A," had never met before November 1993. On four or five occasions between mid-November 1993 and mid-January 1994, defendant approached "A," a 10-year-old boy, at a bus stop. Each of defendant's conversations with "A" occurred in public, in the presence of other people. During those contacts, defendant talked to "A" about "skipping" school and "doing things that his parents would not let him do." On one occasion, when defendant learned that "A" was interested in karate, he offered "A" free lessons in his apartment, telling "A" that he was welcome to come any time, so long as he came alone. On another occasion, defendant asked "A" whether he had ever seen a *Playboy* magazine. When "A" replied, "No," defendant offered him a *Playboy* if he would come to defendant's apartment.

Although defendant invited "A" to his apartment and gave him the address and telephone number, "A" never went to the apartment. In their conversations, defendant never mentioned homosexuality to "A," touched "A," or asked

---

[1] ORS 161.405(1) provides:

"A person is guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime."

[2] ORS 163.405 provides, in part:

"(1) A person who engages in deviate sexual intercourse with another person or causes another to engage in deviate sexual intercourse commits the crime of sodomy in the first degree if:

"* * * * *

"(b) The victim is under 12 years of age[.]"

"Deviate sexual intercourse" is defined in ORS 163.305 as:

"(1) [S]exual conduct between persons consisting of contact between the sex organs of one person and the mouth or anus of another."

"A" to engage in sexual activity. Ultimately, after "A" told his father about his contacts with defendant, the father contacted the police, and defendant was charged with attempted sodomy in the first degree.

In its case-in-chief, the state proffered letters that defendant had written to "L," an under-age male, and to "L's" parents (collectively the " 'L' letters"). Defendant wrote the "L" letters in March 1994, after his contacts with "A," while he was an inmate at the Benton County corrections facility. The letter to "L" included the following statement:

> "First of all, I would like to point out that I didn't know that showing a Playboy magazine to you was illegal. If I did I never would of let you see it. I apologize for this. * * * Second, I realize that asking to have sex with you was wrong. I apologize for doing this."

The letter to "L's" parents stated, in part:

> "About me asking ['L'] if I could teach him about homosexuality. It is true that I was homosexual. * * * I humbly and deeply apologize for showing a Playboy to ['L'] and trying to get him to let me have sex with him."

The letters do not identify when the incident with "L" occurred or "L's" age at that time. The references to *asking* to have sex with you" and *"trying* to get him to let me have sex with him" strongly suggest that defendant's conduct towards "L" did not go beyond solicitation; there is no implication to the contrary.[3]

Defendant objected to the letters as being more prejudicial than probative and as being inadmissible evidence of prior bad acts. OEC 404(3). The state countered that the letters were admissible to prove that, when defendant contacted "A" and asked "A" to come to his apartment, he did so with the specific intent of inducing "A" to engage in sodomy. The court overruled defendant's objection:

> "The ['L' letters allude] to the use of *Playboy* as a device to entice young boys. The Court finds that, insofar as [defendant's conduct towards 'A'], the use of *Playboy* is, in essence,

---

[3] The state did not present any other evidence pertaining to defendant's relationship with, or conduct toward, "L."

a signature of the defendant. * * * I find that the relevance * * * is not outweighed by any unfair prejudice to the defendant."

Thereafter, at the close of all evidence, the court denied defendant's motion for a judgment of acquittal and found defendant guilty of attempted sodomy in the first degree:

"The Court finds intentional conduct. The Court finds that there were efforts to cultivate the child's interest in going to the defendant's residence. * * * These conversations occurred at the bus stop and demonstrates the defendant was, in essence, seeking the child out. Conversations about the child's — about things the child's parents would not allow him to do, such as skipping school, demonstrated the defendant was intending to provide a safe haven for the child should the child intend to skip school. The defendant offered free karate lessons, but the karate lessons were available only if the child attended the home alone. The defendant's intent is further demonstrated by a knowing violation of the terms of his probation by contacting minors.

"Use of the *Playboy* magazine first interjected sex into the conversation, and the Court believes that the defendant was using the magazine as a device to attract the child to his home.

"The Court finds a substantial step, as well. The act must be strongly corroborative of actor's criminal [intent] and purpose. It must advance and verify the plan. The evidence demonstrates there was a substantial step. The active enticement efforts over a period of time, seeking out the intended child at the bus stop, providing his name and address on a slip of paper, are all corroborative of that purpose."

On appeal, defendant assigns error to: (1) the trial court's admission of the "L" letters; and (2) the denial of his motion for judgment of acquittal. The second assignment of error, if successful, affords more conclusive relief than the first—*i.e.,* outright reversal, rather than reversal and remand for a new trial—and is not dependent on our disposition of the first assignment. *See State v. Verdine*, 290 Or 553, 558, 624 P2d 580 (1981) (trial court's denial of motion for judgment of acquittal is reviewed in the light of all evidence

admitted at trial, and not only the evidence properly admitted). Consequently, we consider defendant's second assignment of error first.

■■ In reviewing the denial of a motion for judgment of acquittal, we determine whether the evidence was sufficient to permit a trier of fact to find defendant guilty beyond a reasonable doubt. *State v. King*, 307 Or 332, 768 P2d 391 (1989). In so doing, we resolve any conflicts in the evidence in favor of the state and give the state the benefit of all reasonably related inferences. *State v. Krummacher*, 269 Or 125, 137-38, 523 P2d 1009 (1974).

To prove attempted sodomy in the first degree, the state was required to prove that defendant: (1) "intentionally engage[d] in conduct" that (2) "constitute[d] a substantial step toward commission" of that crime. ORS 161.405; *State v. Walters*, 311 Or 80, 85, 804 P2d 1164 (1991), *cert den* 501 US 1209 (1991) ("*Walters*"). Defendant does not contest the sufficiency of evidence with respect to the first, intent element—*i.e.*, given the admission of the "L" letters, he does not dispute that those letters constituted sufficient proof of intent. However, defendant does assert that the state's evidence, even including the "L" letters, was insufficient to prove a "substantial step" toward the commission of sodomy in the first degree.

The state responds that this case is closely analogous to *Walters* and that, under *Walters*, the evidence here was legally sufficient to prove a "substantial step." Defendant counters that *Walters* was effectively superseded by *Walters v. Maass*, 45 F3d 1355 (9th Cir 1995) ("*Maass*"), in which the court granted federal habeas corpus relief, holding that the same evidence that was before the Oregon Supreme Court in *Walters* was legally insufficient to prove a "substantial step" towards the commission of certain crimes. Defendant contends that *Maass*, not *Walters*, is controlling and that, in all events, *Walters* is materially distinguishable from this case.

We turn, then, to *Walters* and *Maass*. In August 1987, Walters approached a 13-year-old girl at a garage sale and asked if she would help him look for a nonexistent white German Shepard. When the girl refused, Walters offered her money, which she also refused. Walters then offered to drive

the girl home in his truck, but she declined. After Walters followed the girl to her house, the child's mother called the police. When the police arrived and questioned Walters, he admitted offering the girl money if she would get into his truck and, when asked whether he was sexually attracted to the girl, he responded that he "could have got himself in an uncomfortable position today and didn't mean to" and commented that the girl was "13 going on 24." 311 Or at 83.

Walters was charged with attempted kidnapping in the first degree, attempted rape in the first degree, and attempted sodomy in the first degree. In the ensuing trial, the state offered evidence of Walters' prior convictions for rape and sodomy arising out of an incident in 1981. On that occasion, Walters had approached another 13-year-old girl and had also asked her if she had seen a nonexistent white German Shepard. He offered her $20 to help look for the dog and, when she refused, he forced her into his car and raped and sodomized her. The trial court, over a defense objection, admitted the evidence of the 1981 incident and convictions as evidence of intent under OEC 404(3). Later, the trial court denied Walters' motion for judgment of acquittal based on the alleged insufficiency of the state's proof of either criminal intent or commission of a "substantial step" within the meaning of ORS 161.405.

In appealing his convictions, Walters argued that: (1) the court improperly admitted evidence of the details of the 1981 conviction; and (2) the state's evidence was insufficient to prove either that he intended to commit kidnapping, rape, and sodomy or that he had engaged in conduct that constituted a substantial step toward the commission of those crimes.

We held that the 1981 crime evidence was properly admitted pursuant to OEC 404(3), but that that evidence was, nevertheless, insufficient to prove Walters' intent to commit kidnapping in the first degree, rape, or sodomy with respect to the 1987 incident:

"Here, however, the evidence was insufficient to show that defendant intended to act as he had in 1981. It is true

that, from defendant's persistent efforts, in spite of the victim's refusal, to entice her into his truck to look for a nonexistent dog, the jury could conclude that defendant intended to interfere substantially with her liberty and to take her from one place to another. *See* ORS 163.225; ORS 163.225; ORS 163.235. The jury could also conclude from defendant's behavior and remarks to the victim's mother and the police officer that he was sexually attracted to the victim. There is nothing in the record, however, to permit the jury to infer that defendant intended to injure the victim physically or to rape or sodomize her." *State v. Walters*, 99 Or App 570, 575, 783 P2d 531 (1989).[4]

We concluded that the evidence was sufficient, however, to support a conviction on the lesser included offense of attempted kidnapping in the second degree, ORS 163.225, which did not require an intent to injure the victim physically. *Id.*

The Supreme Court reversed and reinstated Walters' convictions. In so holding, the court first determined that the proof of Walters' specific intent to commit rape, sodomy, and kidnapping in the first degree was sufficient because, given the "great similarity" between the circumstances of the charged crimes and the 1981 rape and sodomy, the jury could reasonably infer that the defendant "possessed the identical intent" in both instances. 311 Or at 84-85. The court then turned to the "more troublesome question [of] whether there is sufficient evidence from which a jury could find that defendant's conduct constituted a *substantial step* toward the commission of each of those crimes." *Id.* at 85 (emphasis in original). The court concluded that Walters' conduct in attempting to entice the complainant into his truck, when coupled with his contemporaneous admissions, was sufficient to support his convictions:

"ORS 161.405 codifies the Model Penal Code's 'substantial step' test for distinguishing acts of preparation from an

---

[4] We further held that the state's evidence was legally insufficient to prove intent to commit the lesser included offense of attempted sexual abuse in the first degree, ORS 163.425, because there was insufficient evidence that Walters intended to use forcible compulsion against the victim. *Id.* at 575 n 5. Similarly, we held that there was insufficient evidence of attempted sexual abuse in the second degree, ORS 163.415, because there was inadequate proof that Walters intended to have sexual contact with the victim. *Id.* at 575-76.

attempt. 'In § 5.01(2), the Model Penal Code states that to be a substantial step the act must be "strongly corroborative of the actor's criminal purpose[,]" ' Commentary to the Oregon Criminal Code of 1971, § 54, at 49, *i.e.*, defendant's conduct must (1) advance the criminal purpose charged and (2) provide some verification of the existence of that purpose. Model Penal Code and Commentaries (Official Draft and Revised Comments), American Law Institute 352, § 5.01 (1985). We note that the Model Penal Code specifies a number of situations that 'shall not be held insufficient as a matter of law' if they are strongly corroborative of the actor's criminal purpose. One of those situations is enticement. *Id.*, 5.01(2)(b), at 296 ('enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission'). *See* Commentary to the Oregon Criminal Code of 1971, § 54, at 49 (same principle stated).

"Applying the statutory standard to the facts of the present case, we conclude that defendant's persistent efforts to entice the intended victim into his truck, his following the girl, and his statements to the police officer and to the girl's mother strongly corroborate his criminal purpose to kidnap, rape, and sodomize the 13-year-old girl.[9] We hold, therefore, that there was sufficient evidence from which the jury could find beyond a reasonable doubt that defendant's conduct constituted a substantial step toward the commission of each of the charged crimes.

---

"[9] This case illustrates the proposition that the same conduct may constitute a substantial step toward the commission of more than one charged crime, as long as that conduct strongly corroborates the actor's criminal purpose underlying each charged crime." *Walters*, 311 Or at 85-86 (some footnotes omitted).

Walters subsequently sought federal habeas corpus relief, arguing, *inter alia*, that his convictions were based on legally insufficient evidence. After the district court and the Court of Appeals initially[5] denied his claims, the Ninth Circuit, on rehearing, granted relief with respect to the attempted rape and attempted sodomy convictions. *Maass*, 45 F3d 1355. The court held that, although the state's proof of

---

[5] *See Walters v. Maass*, 11 F3d 892 (9th Cir 1993).

Walters' criminal *intent* to commit kidnapping, rape, and sodomy was legally sufficient, the state had failed to adduce constitutionally sufficient proof that Walters had engaged in conduct representing a *substantial step* towards the commission of rape and sodomy:

> "At some point the link between the enticement and the charged crimes becomes too attenuated: we cannot say that the enticement strongly corroborates any intent to commit those crimes such that a 'reasonable observer, viewing it [the enticement] in context[,] could conclude beyond a reasonable doubt that it was undertaken in accordance with a design' to commit the crimes.
>
> "The only step Walters took toward the commission of the charged crimes was his attempt to entice the victim into his truck. It may be that this act to some extent corroborates Walters' intent to commit some sexual assault, but we cannot agree that it *strongly* corroborates his intent to commit those crimes. Moreover, attempting to entice the victim into a truck does not, in the ordinary and likely course of events, result in the crimes of rape and sodomy." 45 F3d at 1359-60 (quoting *United States v. Scott*, 767 F2d 1308, 1312 (9th Cir 1985)) (citations omitted).

Judge Tang, dissenting, observed:

> "Oregon appears on the verge of criminalizing pure (albeit bad) thought. But in finding sufficient evidence of a 'substantial step' toward rape and sodomy in Walters's efforts to have his intended victim get into his truck, the Oregon Supreme Court retains at least a vestige of the *actus reus* requirement.
>
> "\* \* \* \* \*
>
> "Because there is sufficient evidence to support a finding of enticement under Oregon law, we should defer to state law and uphold Walters's convictions. *See Estelle v. McGuire*, 502 US 62, 67-69, 112 S Ct 475, 480, 116 L Ed 2d 385 (1991) ('[I]t is not the providence of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.')." *Id.* at 1361.

■ Defendant argues that *Maass* "controls this case." We disagree. At the most literal level, except for decisions of the United States Supreme Court, a federal court's pronouncements on questions of federal constitutional law do not "control" this, or any other, state court. Those pronouncements may be instructive, even persuasive, but they are hardly dispositive. *See, e.g., Mears v. Marshall,* 138 Or App 476, 478, 909 P2d 212 (1996); *accord AFSD v. Northland Insurance Co.,* 139 Or App 92, 100, 911 P2d 942 (1996).

Even more to the point, we *are* bound by the decisions of the Oregon Supreme Court. Although the holding in *Maass* is phrased in terms of "constitutional insufficiency of the evidence," 45 F3d at 1360, it ultimately rests on precisely the same substantive standard of evidentiary sufficiency that our Supreme Court applied in *Walters. Compare* 45 F3d at 1358-59 *with* 311 Or at 83-85. Thus, *Maass* and *Walters* apply the same standard to the same evidence and reach different results on the central issue of whether Walters' conduct was sufficiently corroborative of the charged criminal purpose. However persuasive the former, we must adhere to the latter.

■ Here, as in *Walters,* defendant's efforts to induce "A" into accompanying him to a private place within his exclusive control could reasonably be deemed to have facilitated the crime of sodomy. Defendant *could* have invited "A" to his apartment for a variety of purposes, including innocent purposes. However, it is equally apparent that privacy, if not necessarily a prerequisite for seduction and sodomy, substantially facilitates such conduct. Thus, although defendant did not succeed in inducing "A" to come to his apartment, his efforts to do so, like Walters' unsuccessful efforts to entice the girl into his truck, sufficiently "advance[d] the criminal purpose."

■ The closer, more difficult issue is whether defendant's conduct "provided some verification of the existence" of attempted sodomy. *Id.* Although *Walters* does not expressly so state, the "verification" component must have a different content from the first, "advance[d] the purpose" component. Otherwise, they would not be phrased in the conjunctive; that is, if all conduct that satisfied the former also satisfied

the latter, the latter would be superfluous. Our understanding is that, unlike the "advance[d] the purpose" component, which can be satisfied even by conduct that arguably could promote a variety of ends, both criminal and noncriminal, the "verification" requirement requires conduct that is referable to *some* criminal purpose.

We note, moreover, that *Walters* does not seem to require *exact* "verification" of the *particular* criminal purpose charged. For example, although Walters' conduct bespoke a purpose of engaging in some general, unspecified, unlawful sexual conduct with the girl, nothing in his words or actions in 1987 pertained to forcible compulsion, which is an element of rape, or to deviate sexual activity, which is an element of sodomy. Instead, the court apparently concluded that once the state proved Walters' specific intent to commit rape and sodomy, conduct evincing a criminal purpose that was consistent with, if not necessarily uniquely referable to, those crimes afforded sufficient "verification." *Accord Walters*, 311 Or at 86 n 9 ("The same conduct may constitute a substantial step toward the commission of more than one crime."). Thus, although Walters' conduct was not uniquely referable to attempted rape or sodomy—*i.e.*, that conduct was also consistent with the other possible, lesser included crimes, including various degrees of sexual abuse—it provided the requisite "verification."

■   So too here. Viewed in its totality, defendant's conduct in (1) engaging in a series of stranger-to-stranger contacts with a 10-year-old boy; (2) speaking with him about "skipping school"; (3) offering him inducements to come to his apartment alone; and (4) offering to show him sexually explicit material, could reasonably be regarded as verifying a criminal purpose. Although defendant's conduct, like Walters', was not uniquely referable to committing sodomy in the first degree in that it included no specific act or reference to deviant sex, such exact correspondence was not required. Rather, once the state presented legally sufficient evidence of defendant's specific intent to commit sodomy in the first degree,[6] proof of conduct demonstrating a criminal purpose

---

[6] As noted, 141 Or App at 360, defendant, although assigning error to the admission of "L" letters, does not contend that the record including those letters was legally insufficient to support a finding of intent.

that was consistent with committing sodomy satisfied the "verification" requirement.

We thus conclude, applying the *Walters'* analysis, that there was evidence in this case from which the jury could find beyond a reasonable doubt that defendant's conduct constituted a substantial step toward the commission of sodomy in the first degree. The trial court properly denied defendant's motion for a judgment of acquittal.

We turn, then, to defendant's alternative assignment of error, that the trial court committed reversible error in admitting the "L" letters under OEC 404(3). Defendant argues, in particular, that those letters were not properly admissible as "signature crime" evidence and that, under the methodology prescribed by *State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986), and reiterated in *State v. Pratt*, 309 Or 205, 210, 785 P2d 350 (1990), the conduct described in those letters was not sufficiently similar to the charged conduct to permit their admission as proof of intent. We agree.

■ OEC 404(3) provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, *intent*, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis supplied.)

Here, the trial court admitted the "L" letters as evidence of a "signature crime." That rationale, as the state implicitly concedes, was incorrect, or at least misstated, because this case was not one in which the identity of the alleged perpetrator of a crime was at issue. *See State v. Pinnell*, 311 Or 98, 109-11, 806 P2d 110 (1991) (prescribing standards for admission of prior crimes tending to prove identity based on *modus operandi*). The state argues, nevertheless, that the trial court did not err because the letters were properly admitted to prove defendant's specific intent.

■■ In determining the admissibility of prior acts evidence as proof of criminal intent under OEC 404(3), the trial court must engage in a two-step inquiry. First, the court

must determine whether the proffered evidence is relevant to the issue of intent, by reference to five considerations:

" '(1) Does the present charged act require proof of intent?

" '(2) Did the prior act require intent?

" '(3) Was the victim in the prior act the same victim or in the same class as the victim in the present case?

" '(4) Was the type of prior act the same or similar to the acts involved in the charged crime?

" '(5) Were the physical elements of the prior act and the present act similar?' " *Pratt*, 309 Or at 211 (quoting *Johns*, 301 Or at 555-56).

Those five conditions are conjunctive; if any is not met, the evidence must be excluded. *Id.* If, but only if, "the answer to *each* of these questions is yes," *id.* (emphasis supplied), does the court proceed to the second inquiry:

" '[I]s the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?' " *Id.* (quoting *Johns*, 301 Or at 556).[7]

The state, as the proponent of the "L" letters, had the burden of demonstrating admissibility under the *Johns* test. *Pratt*, 309 Or at 210.

---

[7] The state suggests that the *Johns* test has been "refined" and implicitly superseded by the three-part inquiry set out in *State v. Johnson*, 313 Or 189, 195, 832 P2d 443 (1992):

"(1) The evidence must be independently relevant for a noncharacter purpose; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that defendant committed it; and (3) the probative value of the uncharged misconduct evidence must not be substantially outweighed by the dangers or considerations set forth in OEC 403. Each of these requirements must be satisfied before uncharged misconduct evidence is admissible under OEC 404(3)." (Footnotes omitted.)

Although *Johnson* may represent a "refinement" of *Johns*, we do not read it as materially altering, much less abrogating, *Johns'* analysis, at least where prior crimes evidence is offered to prove intent. Certainly *Johnson*, a *modus operandi/* identity case, does not purport to do so. Rather, we understand *Johnson's* "independently relevant for a noncharacter purpose test" as incorporating the five cumulative *Johns* relevance factors in cases involving proof of intent.

Here, the state failed to demonstrate that the "L" letters satisfied each of *Johns'* five cumulative conditions of relevance. In particular, the incidents described in the "L" letters did not comport with the fifth (similarity of "physical elements") condition.

In determining whether the physical similarities of the prior act and the present act are sufficiently similar that proof of the former is relevant to the issue of intent for the latter, the court must consider both the similarities and the dissimilarities of the two incidents:

> "The circumstances of each crime as a whole must be compared. First, the trial judge must find that there are significant similarities in the physical elements of the two crimes. If that test is met, then the trial judge must consider the differences between the physical elements of the two crimes. The differences may be minimal—for example, the offender may have used different words to indicate his intent. On the other hand, the differences may be so great that they overwhelm the similarities. The point is: The dissimilarities must be as fully considered as the similarities in answering this question.

> "Determining what constitutes a significant similarity is a matter to be decided on a case-by-case basis. Some similarities are so common as to be trivial (for example, the offender spoke English during both crimes) while others may be so unusual as to be significant even standing along (for example, the offender spoke a foreign language when he intended to rape, but spoke English otherwise). Most often the significance of the similarities will arise out of their combination." *Pratt*, 309 Or at 214.

The material similarities in the "physical elements" of defendant's conduct toward "L" and toward "A" are: Defendant either used, or referred to, *Playboy* magazine in his interactions with both "L" and "A." The material dissimilarities include: (1) Whereas defendant and "A" were strangers, the "L" letters indicate that defendant at least knew, and was probably friendly with, "L" and his parents.[8] (2) Defendant

---

[8] In his letter to "L's" parents, defendant wrote:

"I would appreciate it if you would forgive me and write back. I would like to renew our friendship."

sought out "A" through a series of uninvited contacts. There is no evidence of such unsolicited "seeking out" of "L," whom defendant apparently knew. (3) Defendant engaged "A" in conversations calculated to ingratiate defendant with "A," including references to "skipping school." There is no evidence of such conduct towards "L." (4) Defendant offered "A" inducements, including karate lessons and a *Playboy* magazine, to come to his apartment. Although defendant showed "L" a *Playboy* on at least one occasion, there is no evidence that he ever offered "L" any inducements, including *Playboy* magazines, to come to his apartment or elsewhere. (5) Defendant asked "L" to have sex with him, but never mentioned sex to "A." (6) Defendant spoke with "L" about homosexuality, but never mentioned homosexuality to "A."

■    The dissent contends that our assessment of similarities and dissimilarities overlooks the forest for the trees. 141 Or App at 375-76. We respectfully disagree. The "gravamen" of the "L" incident was explicit efforts, including the use of *Playboy*, to persuade a minor to engage in sexual activity. The "gravamen" of the "A" incident was explicit efforts involving the use of certain inducements, including the prospect of seeing a *Playboy*, to persuade the child to come to defendant's apartment. In the former, the *Playboy* was employed as an aid for seduction; in the latter, the *Playboy* was held out as an inducement, like the promise of free karate lessons, for the child to come to defendant's apartment. We thus conclude that, at least to the extent that we can divine from the "L" letters, the dissimilarities between the physical elements of the two incidents outweigh their similarities.

The dissent's contrary analysis effectively guts the *Johns / Pratt* "physical similarity" requirement. If the dissent is correct, prior instances of attempted, much less completed, sodomy will always be admissible as sufficiently "similar" to show intent in subsequent prosecutions. As a *practical* matter, the fact that a defendant attempted to have sex with one child does, no doubt, have "some tendency" to show that, in later contacting another child, he intended to have sex with him too. But *Johns* and *Pratt* require more *as a matter of law*.

Indeed, in *Pratt*, the court held that the evidence of the defendant's prior forcible rape of one woman was not admissible to show the defendant's specific intent to rape another woman, who was brutally sexually assaulted and murdered and who was last seen in the defendant's company. The court reached that conclusion despite the facts that the defendant was well acquainted with both victims; that both victims were transported from Washington to Oregon; that both were sexually assaulted; and that duct tape was used in both instances. Notwithstanding those common elements, the Supreme Court, viewing the totality of the circumstances, reversed the trial court's determination of sufficient similarity, and concluded:

"Aside from its tendency to show that defendant is the sort of man who commits rape, the Lewis abduction and rape is not probative of defendant's intent to rape Carrie Love." *Pratt*, 309 Or at 214.

The same is true here. "Aside from [their] tendency to show that defendant is the sort of man" who attempts to engage in sexual activity with minor males, the "L" letters are not probative of defendant's intent to sodomize "A." Because the prior conduct did not meet the fifth *Johns* condition, the court erred in admitting the "L" letters.

We consider, finally, whether that error requires reversal. Defendant argues, and the state does not seriously dispute, that the "L" letters were central to the prosecution's proof of defendant's specific intent to commit sodomy in the first degree. That intent is a necessary element of attempted sodomy in the first degree. *Walters*, 311 Or at 85. After reviewing the entire record, we cannot say that there is "little likelihood" that the erroneous admission of the "L" letters affected the verdict. *State v. Hansen*, 304 Or 169, 180, 743 P2d 157 (1987). That error was not harmless.

Reversed and remanded for new trial.

**DEITS, P. J.,** concurring in part, dissenting in part.

I agree with the majority's conclusion that the trial court properly denied defendant's motion for a judgment of acquittal. However, I disagree with its conclusion that the

trial court erred in admitting, under OEC 404(3),[1] the "L" letters into evidence. I believe that when those letters are examined in the light of the concept of relevance, it becomes apparent that the trial court properly admitted them as evidence.

It is important to note at the outset that OEC 404(3) is an "inclusionary" rule of evidence that permits the admission of other acts evidence if it is relevant for a noncharacter purpose. *State v. Hampton*, 317 Or 251, 254, 855 P2d 621 (1993); *State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986). " 'Relevancy is the key to the entire analysis of the admissibility of evidence of other crimes, wrongs, or acts.' " *Johns*, 301 Or at 549 (quoting Krivosha, Lansworth & Pirsch, *Relevancy: The Necessary Element in Using Evidence of Other Crimes, Wrongs, or Bad Acts to Convict*, 60 Neb L Rev 657, 662 (1981)).

OEC 401 sets forth the definition of relevant evidence:

> " 'Relevant evidence' means evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis supplied.)

That standard establishes "a very low threshold that evidence must cross to be considered relevant." *State v. Stevens*, 319 Or 573, 584, 879 P2d 162 (1994).

There is no question that other acts evidence may be relevant to establish that a defendant possessed the requisite intent for his or her currently charged crime. In general, courts liberally admit other acts evidence for that purpose:

> "Intent or state of mind is often the most difficult element of a crime to prove because many crimes are unwitnessed and even if a witness is present, the witness can only surmise the actor's state of mind. Wright and Graham

---

[1] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

assert that courts realize the prosecutor's difficulty in proving *mens rea,* or criminal intent, and *therefore courts very liberally admit prior crime evidence to prove mens rea.* 22 Wright & Graham, Federal Practice and Procedure: Evidence § 5239 (1978). Conversely, this court and other courts have held that evidence of other crimes offered to prove identity is strictly limited to crimes committed 'by the use of a novel means or in a particular manner' so as to earmark the acts as the handiwork of the accused. In other words, to prove identity the prior acts must be a 'signature' crime. *See State v. Manrique,* 271 Or at 208; *State v. Zimmerlee,* 261 Or 49, 53, 492 P2d 795 (1972); McCormick, Evidence, *supra. Such rigidity is not required when admitting prior acts to prove intent or lack of mistake." Johns,* 301 Or at 551 (emphasis supplied); *see also State v. Painter,* 113 Or App 337, 341, 833 P2d 303, *rev den* 314 Or 392 (1992).

When other acts evidence is offered to show intent, relevance is based on the premise that, if a defendant acted intentionally in one situation, a factfinder could reasonably infer that he or she acted intentionally in another, similar situation. *Johns,* 301 Or at 551. The degree of similarity between the events determines the existence, and strength, of that inference.

In *Johns,* the Supreme Court set forth five questions that must be answered affirmatively in order to conclude that a defendant's other acts are sufficiently similar to his or her charged conduct so as to be considered relevant:

" '(1)   Does the present charged act require proof of intent?

" '(2)   Did the prior act require intent?

" '(3)   Was the victim in the prior act the same victim or in the same class as the victim in the present case?

" '(4)   Was the type of prior act the same or similar to the acts involved in the charged crime?

" '(5)   Were the physical elements of the prior act and the present act similar?' " *State v. Pratt,* 309 Or 205, 211, 785 P2d 350 (1990) (quoting *Johns,* 301 Or at 555-56).

The issue presented here is whether the events described in the "L" letters are sufficiently similar to defendant's charged acts so that they can be said to be relevant to

show defendant's intent with respect to those acts. Defendant *does not* argue that the trial court should have excluded the "L" letters under OEC 403.[2] Thus, we are not concerned with *how* probative the "L" letters are, but, instead, whether they meet the minimum requirements for relevance. Accordingly, the "L" letters are admissible if they describe events similar enough to defendant's charged conduct to have "any tendency" to make the existence of the defendant's intent with respect to the charged conduct more probable than it would be without the letters.

The majority concludes that the state failed to satisfy one of the five pertinent inquiries under *Johns*; specifically, it concludes that the state did not establish that the physical elements of the "L" incident are similar to those here. However, in its rigorous analysis of that *Johns* question, the majority appears to have lost sight of the underlying principle of relevance. The majority seems to give equal weight to identified differences and similarities regardless of their significance to the issue of defendant's intent to sodomize "A." As the Supreme Court explained in *Pratt*, however, the significance of identified similarities and differences must be considered in the light of the particular circumstances. *Id.* at 214. That is very much a case-by-case determination.

The majority states that the only material similarity between the two events is that "[d]efendant either used, or referred to, *Playboy* magazine in his interactions with both 'L' and 'A.' " 141 Or App at 369. It then sets out what it views to be the material dissimilarities:

"(1)  Whereas defendant and 'A' were strangers, the 'L' letters indicate that defendant at least knew, and was probably friendly with, 'L' and his parents.[ ] (2) Defendant sought out 'A' through a series of uninvited contacts. There

<hr>

[2] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

Under *Johns,* the analysis contained in OEC 403 constitutes the sixth, and final, question that a trial court must consider when deciding to admit evidence of other acts. *Johns,* 301 Or at 556.

is no evidence of such unsolicited 'seeking out' of 'L,' whom defendant apparently knew. (3) Defendant engaged 'A' in conversations calculated to ingratiate defendant with 'A,' including references to 'skipping school.' There is no evidence of such conduct towards 'L.' (4) Defendant offered 'A' inducements, including karate lessons and a *Playboy* magazine, to come to his apartment. Although defendant showed 'L' a *Playboy* on at least one occasion, there is no evidence that he ever offered 'L' any inducements, including *Playboy* magazines to come to his apartment or elsewhere. (5) Defendant asked 'L' to have sex with him, but never mentioned sex to 'A.' (6) Defendant spoke with 'L' about homosexuality, but never mentioned homosexuality to 'A.' " *Id.* at 369-70 (footnote omitted).

The majority ultimately concludes "that, at least to the extent that we can divine from the 'L' letters, the dissimilarities between the physical elements of the two incidents outweigh their similarities." *Id.* at 370.

However, in my view, the majority's conclusion is drawn from an improperly narrow perspective of defendant's conduct as well as a failure to weigh the significance of the similarities and differences in defendant's conduct in view of the particular circumstances. In the letter to "L's" parents, defendant apologized for "trying to get ['L'] to let [defendant] have sex with him." From that statement, it is apparent that defendant was concerned with *persuading*, as opposed to forcing, "L" to have sex with him. It is also reasonable to infer that the other sexually inappropriate behavior described in the letter was designed to facilitate that event. Thus, the most significant aspect of defendant's prior act, as described in the "L" letters, is that he used manipulative, as opposed to forceful, conduct designed to coax a minor male to have sex with him.

The majority fails to consider the essence of defendant's prior conduct as described above. Instead, it focuses on details that are really immaterial and not entitled to much weight. For example, the majority's observation that defendant appears to have been acquainted with "L" and not with "A" is immaterial. The fact that defendant appears to have been acquainted with "L" and not "A" has little bearing on the key issue here—whether the "L" letters have "any tendency"

to show that defendant intended to sodomize "A." It is apparent from the "L" letters that defendant desired to sodomize "L." Although it appears, at least from what he says in the letter, that defendant was acquainted with "L," there is no evidence that defendant was sexually attracted only to minor boys with whom he was acquainted. The fact that he was acquainted with "L" may have helped defendant to gain access to him. However, the issue is not *how* defendant made contact with his victims, but *what he intended to do* after making contact. Thus, defendant's unfamiliarity with "A," as opposed to his possible acquaintance with "L," is immaterial.

Other differences identified by the majority are equally insignificant. The majority's reliance on its belief that defendant "sought out" "A" and not "L" and attempted to "ingratiate" himself with "A" and not "L" is a red herring. If, as the majority believes, defendant was acquainted with "L," then there would have been no need for defendant to seek out "L" or engage him in ingratiating conduct. Similarly, there would have been no need to offer "L" "any inducements" to come to defendant's apartment. Admittedly, defendant did not expressly discuss sex and homosexuality with "A." However, he did, during his last contact with "A," broach a sexually explicit topic by offering to show "A" a *Playboy* magazine if "A" came to his apartment.

Finally, in partial defense of its conclusion, the majority states that defendant's manipulative conduct in both instances was designed to achieve different goals:

> "The 'gravamen' of the 'L' incident was explicit efforts, including the use of *Playboy*, to persuade a minor to engage in sexual activity. The 'gravamen' of the 'A' incident was explicit efforts involving the use of certain inducements, including the prospect of seeing a *Playboy*, to persuade the child to come to defendant's apartment. In the former, the *Playboy* was employed as an aid for seduction; in the latter, the *Playboy* was held out as an inducement, like the promise of free karate lessons, for the child to come to defendant's apartment." *Id.* at 370.

However, the majority's conclusion with respect to defendant's first assignment of error makes that perceived difference illusory. The majority concludes that the trial court

properly denied defendant's judgment of acquittal, because "there was evidence in this case from which the jury could find beyond a reasonable doubt that defendant's conduct [toward 'A'] constituted a substantial step *toward the commission of sodomy in the first degree.*" *Id.* at 367 (emphasis supplied). Thus, under the majority's own reasoning, defendant's manipulative conduct here was directed at more than simply enticing "A" to come to his apartment. As in the "L" incident, defendant's conduct here was designed to engage in sodomy with a minor male. When properly considered, all of the above differences identified by the majority are insignificant.

Conversely, when analyzed in the proper light, the physical elements of both events are sufficiently similar. The "L" letters indicate that defendant wanted to sodomize "L," a minor male. They also describe defendant's attempts to manipulate "L" to that end. Such manipulation included: (1) asking "L" if defendant could teach him about homosexuality; (2) showing "L" a *Playboy*; and (3) asking "L" if defendant could have sex with him. Here, defendant approached and initiated conversations with "A," a minor male, four to five times at a bus stop. His conduct during those encounters was also manipulative: (1) discussing the possibility of "A" skipping school; (2) asking what activities that "A" would like to do that were forbidden by his parents; (3) giving "A" his address; (4) asking what sports "A" liked and, after discovering that "A" was interested in karate, offering free lessons at his apartment but only if "A" came alone; and (5) offering to show "A" a *Playboy* if he came to defendant's apartment. Defendant's conduct in both instances illustrates a very deliberate attempt to manipulate minor males to participate in sexually related activities. Although some minor differences exist, I believe that the physical elements of defendant's prior conduct are sufficiently similar to those here to have *some tendency* to show his intent with respect to the charged crime. *See Painter*, 113 Or App at 339-41. Therefore, I believe that the majority incorrectly concludes that the "L" letters are not relevant and, accordingly, not admissible because the physical elements of the events are not sufficiently similar.

Contrary to the majority's assertion, my conclusion does not "gut" the physical similarities requirement of the *Johns* analysis. I am not contending that, absent significant similarities between the two events, a prior act of sodomy or attempted sodomy of a child will always be relevant to show a defendant's intent in a subsequent prosecution for the same offense. As noted above, that is a case-by-case determination. I simply believe that, unlike with the instances of rape and murder in *Pratt*, the physical elements of the "L" incident and defendant's charged conduct here are sufficiently similar so as to conclude that the "L" letters are relevant and admissible under OEC 404(3).

In summary, I believe that the majority takes an improperly narrow view of defendant's conduct here and that described in the "L" letters. Then, under *Johns*, it isolates minute differences without reference to the underlying policy of relevance, fails to consider the significance of the differences under the particular circumstances, and determines that the "L" letters are inadmissible under OEC 404(3). In my view, when defendant's conduct, here and illustrated by the "L" letters, is viewed in the proper perspective and analyzed in the light of relevance, it becomes evident that the trial court properly allowed the "L" letters into evidence. For all of the above reasons, I respectfully dissent.