Argued and submitted January 27, reversed and remanded in part; otherwise affirmed September 15, 1999

## STATE OF OREGON,
*Respondent,*

*v.*

## FRED LEWIS IRONS,
*Appellant.*

## (CF96-399; CA A98998)

987 P2d 547

Jesse Wm. Barton, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Ann F. Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

HASELTON, J.

## HASELTON, J.

Defendant appeals from a judgment of conviction and sentence for one count of rape in the first degree, ORS 163.375, two counts of unlawful sexual penetration in the first degree, ORS 163.411, two counts of sexual abuse in the first degree, ORS 163.427, and one count of criminal mistreatment in the first degree, ORS 163.205, all arising from defendant's conduct towards "C," a six-year-old girl. Defendant assigns error, *inter alia,* to the trial court's denial of his motion *in limine* to exclude certain portions of his videotaped interview with the police.[1] He argues principally that that evidence, which referred to incidents of uncharged prior misconduct, including defendant's 14-year incestuous relationship with his stepdaughter beginning when she was 14, was inadmissible under OEC 404(3). We affirm in part and reverse in part.

In April 1996, Hermiston Police Officer Denise Moore, received a report that defendant had sexually abused "C," the six-year-old daughter of a friend, whom he regularly babysat. Moore interviewed "C" and then, on May 1, conducted a videotaped interview of defendant. At the beginning of the interview, Moore told defendant that allegations of sexual abuse had been made against him, and she indicated that she was aware that he previously had been accused of sexual abuse. Defendant admitted that he had, in fact, had a sexual "relationship," which included intercourse, with his stepdaughter beginning when she was 14 years old and continuing until she was 28. That relationship had ended several years before. When Moore suggested that some children "turned [defendant] on" sexually, defendant acknowledged that his stepdaughter had so affected him.

Moore also told defendant that authorities had received a report that defendant's son had, in the past, had "red around his anus." Defendant responded that that report had "nothing to do with any kind of sex," and, when asked specifically, defendant flatly denied ever touching his son.

---

[1] Defendant also assigns error to the trial court's imposition of Ballot Measure 11, ORS 137.700, sentences. Each of defendant's challenges has been rejected by the Supreme Court or this court in prior cases.

Later, when Moore asked him whether he would have touched his son if he had been a girl, defendant replied, "I don't think so."

During the interview, defendant and Moore also extensively discussed defendant's contact with "C" over the preceding months. Defendant admitted that he took care of "C" one or two days a month and that she had occasionally spent the night at his home. He acknowledged that he had taken baths naked with "C" on "four or five" occasions and said that they had agreed to keep that their "secret." Defendant also admitted that he had put lotion on "C's" "crotch" area but denied that it was for a sexual purpose. Rather, he explained, he had applied the lotion because "C" did not wipe herself well and was "all blistered." Although defendant initially stated that he had rubbed the lotion "in her crotch," he adamantly denied any insertion or penetration of the vagina or rectum. When Moore asked defendant if he thought there was anything wrong with putting lotion on "C," defendant responded, "not if the right person did it, but I should not have been doing it."

Toward the end of the interview, Moore asked defendant if he wanted to write an apology letter to "C." Defendant agreed. As defendant was writing that letter, and while he was still being videotaped, Moore received a telephone call from another person. That call was unrelated to defendant, but Moore's side of the conversation could be clearly heard on the video. During that conversation, Moore asked the caller if he was still willing to take a polygraph examination but indicated that it might not be necessary. Thereafter, Moore hung up, defendant finished his letter, and Moore questioned him about the meaning of the letter's content. Moore then placed defendant under arrest and ended the interview.

Defendant was indicted on one count of first-degree rape, ORS 163.375, two counts of unlawful sexual penetration in the first degree, ORS 163.411, two counts of sexual abuse in the first degree, ORS 163.427, and one count of criminal mistreatment in the first degree, ORS 163.205.[2]

---

[2] The original indictment did not include the criminal mistreatment charge. However, the indictment was amended, and defendant was convicted under the amended indictment, which included criminal mistreatment.

On March 31, 1997, at a pretrial hearing, and in anticipation that the state intended to offer the videotape of the interview in its case-in-chief, defendant moved to exclude portions of the tape.[3] Defendant specifically sought to exclude those portions relating to: (1) defendant's discussion of the long-term sexual relationship with his stepdaughter; (2) Moore's questions about whether defendant had sexually abused his son; and (3) Moore's telephone conversation discussing the polygraph with the third party. The trial court ruled that the evidence was "in," stating that defendant's motion "regarding prior bad acts, [would] be disallowed, as well as the polygraph." The court offered no explanation for its denial of the motion and made no findings. The court granted defendant a continuing objection to the introduction of that evidence, and the case proceeded to trial before a jury.

At trial, the state presented testimony of six witnesses, as well as the entire videotaped interview of defendant. "C" testified describing defendant's conduct, including testifying that he had hurt her when he touched her and put his "privates and his finger" inside her vagina and rectum. In addition, the state presented the testimony of "C's" mother, a nurse practitioner who examined "C" for possible sex abuse, an employee with Services for Children and Families who had interviewed "C" on two occasions regarding the alleged abuse, and a therapist who had counseled "C." Each of those witnesses recounted what "C" had told them regarding the alleged abuse. The state offered no physical or medical evidence corroborating abuse.

The defense presented one witness, a physician, who testified that, in the weeks just before the time of the videotape interview, he had prescribed for defendant an opiate-based pain medication that might have affected the voluntariness of defendant's statements. The jury convicted defendant on all counts, and the court sentenced him under ORS 137.700 to a total consecutive sentence of 290 months.

---

[3] Defendant first moved to suppress all of his statements in the interview on the theory that they were involuntary. The court denied that motion. On appeal, defendant does not challenge that ruling.

On appeal, defendant asserts, as he did at trial, that certain portions of the videotaped interview were inadmissible and, consequently, that the trial court erred when it denied his motion *in limine* to exclude those portions. Specifically, he assigns error to the admission of those portions relating to: (1) defendant's discussion of the incestuous relationship with his stepdaughter; (2) Moore's questioning him about whether he had sexually abused his son; and (3) Moore's telephone conversation discussing the polygraph.

■ We first address defendant's argument that the trial court erroneously admitted those portions of the video in which Moore questioned him about his incestuous relationship with his stepdaughter. Defendant asserts that that evidence was inadmissible propensity evidence. OEC 404(3).[4] Defendant contends, particularly, that, to the extent the state purported to offer that evidence as proof of his state of mind, the evidence did not satisfy certain foundational requirements for such evidence prescribed in *State v. Johns*, 301 Or 535, 725 P2d 312 (1986):

"(1) Does the present charged act require proof of intent?

"(2) Did the prior act require intent?

"(3) Was the victim in the prior act the same victim or in the same class as the victim in the present case?

"(4) Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5) Were the physical elements of the prior act and the present act similar?" *Id.*, at 555-56.[5]

Defendant argues principally, that, given the differences between the alleged abuse of a six-year-old neighbor child and a prolonged relationship with a sexually mature family

---

[4] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[5] If any of those criteria is not satisfied, the evidence must be excluded. *See, e.g., State v. Pratt*, 309 Or 205, 211, 785 P2d 350 (1990); *State v. Rinkin*, 141 Or App 355, 368, 917 P2d 1035 (1996).

member, evidence of the incestuous relationship could not satisfy *Johns'* third (same class of victim), fourth (same type of act), and fifth (same physical elements) requirements.[6]

■ The state responds at two levels. First, it contends that defendant failed to raise and preserve his present *Johns*-based objections before the trial court. Second, even if defendant adequately preserved those arguments, the trial court properly admitted the evidence.

Defense counsel's *in limine* motion to exclude the videotape excerpts pertaining to the incestuous relationship (and to defendant's conduct with his son) was made orally:

"There were statements that Mr. Irons made about some prior allegation of sexual contact with his daughter, apparently a daughter who lives in California. There was also some allegation apparently of sexual contact of Mr. Irons with his son * * *.

"* * * * *

"What the defense is asking for is that those references be retracted [*sic*] from the tape when they offer the tape, to be excluded and the officer not testify about the other items mentioned in the interview.

"* * * * *

"The objection to a prior bad act is not that it didn't happen but rather that it is so prejudicial and its probative value in this particular case is so minimal that it would, in effect, deny Mr. Irons a fair trial.

"* * * It would be very inflammatory for the jury. *I don't think that any of the five exceptions under 404 for a prior bad act would come in in this case.*

"There's no allegation or no offer by the defense that this was a mistake *or * * * by the State that he intended to do this and that there is some type of signature crime here* so I

---

[6] Defendant also argues that the incest-related evidence should have been excluded because its prejudicial impact substantially outweighed its probative value. OEC 403. Given our disposition, we need not address that argument. *But see* OEC 404(4); *State v. Dunn,* 160 Or App 422, 430, 981 P2d 809 (1999) ("If the evidence is relevant under those traditional standards [*Johns'* first five requirements], OEC 404(4) makes it admissible without balancing under OEC 403 unless the state or federal constitution requires that balancing.").

think that that evidence would be too prejudicial for the jury to be able to get through. It's not very probative in this particular case * * *." (Emphasis added.)

The state responded:

"[I]t's the State's position that this prior bad act concerning the daughter, stepdaughter especially, I think it does go to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"The defense—it's the defendant's own words was that he was merely just putting lotion on ['C']. But, I think showing that he has been—had—sexual contact with other young girls, I think that that goes toward intent, absence of mistake. I think that that is allowed in."

The trial court, without elaboration, ruled that the evidence was "in." Neither defense counsel, the prosecution, nor the court referred to *Johns* or to any of its "similarity" requirements.

■ In determining whether the foregoing colloquy adequately preserved defendant's present contentions that the evidence of the incestuous relationship did not meet particular *Johns* requirements, we refer to the pragmatic principles that underlie our preservation jurisprudence. While often described in terms of "issue," "argument," and "source" of authority, *State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988), our analysis ultimately turns on two overarching considerations:

"First, the requirement that an issue be presented to the lower tribunal in order for it to be raised on appeal serves to prevent error. If the first tribunal is given the opportunity to make a ruling, its ruling may well be correct. Relatedly, it would be a disservice to the economy of the process to require the lower tribunal to conduct further proceedings in order to rectify an error that it was never given the initial opportunity to avoid.

"The second reason is that requiring a party to present its issues at each adjudicative level is essential to a fair process for the other parties and participants. Generally, the opportunity to respond at the appellate level does not cure the denial of that opportunity in trial court and agency

proceedings, where all of the factual and much of the legal development of cases must occur." *J. Arlie Bryant, Inc. v. Columbia River Gorge Comm.,* 132 Or App 565, 568, 889 P2d 383, *rev den* 321 Or 47 (1995).

*See Davis v. O'Brien,* 320 Or 729, 737, 891 P2d 1307 (1995) (preservation requirements are intended to ensure that "the positions of the parties are presented clearly to the initial tribunal and that parties are not taken by surprise, misled, or denied opportunities to meet an argument"). *See also State v. Doern,* 156 Or App 566, 579, 967 P2d 1230 (1998), *rev den* 328 Or 666 (1999) (Landau, J., dissenting) (describing preservation inquiry as: "Did the trial court have a realistic opportunity to make the right call?"); *Lutz v. State of Oregon,* 130 Or App 278, 286, 881 P2d 171 (1994) (Haselton, J., concurring) ("Given [the] realities [of trial practice], preservation and reviewability are best regarded not as 'rules' of arithmetic precision, but as flexible, often benign, principles.").

Applying those principles, we conclude that defendant's objection before the trial court was adequate to preserve the challenges he now makes. Defendant's objection broadly invoked OEC 404(3), asserted that none of the exceptions to that rule applied, and then, more particularly, asserted that the evidence was not relevant to intent because "[t]here's no allegation * * * by the state that he intended to do this and there is some type of signature crime here." Although inexact, the reference to "signature crime" in the context of an OEC 404(3) argument about the admissibility of "prior bad acts" as evidence of intent reasonably alerted the prosecutor and the trial court that defendant was disputing whether the evidence satisfied the foundational "similarity" requirements for such evidence. *See generally Rinkin,* 141 Or App at 367 (applying *Johns* analysis to evidence of intent that trial court imprecisely admitted as "signature crime" evidence).[7] The prosecutor's response, referring to the nature of the prior misconduct "sexual contact with other young girls"—evinced his understanding of the thrust of defendant's objection. That understanding is unsurprising given

---

[7] Noting that "signature crime" refers, most precisely, to *modus operandi* cases in which evidence is proffered to establish identity of perpetrator. *Rinkin,* 141 Or App at 367.

the ubiquity of the *Johns* analysis as a virtual template under OEC 404(3).[8] Defendant's objection thus reasonably alerted the prosecutor and the court that the *Johns* analysis was fairly "in play." *See State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987) (state, as "the proponent of uncharged misconduct evidence * * * must convince the court that the evidence is * * * logically relevant"); *State v. Wert*, 144 Or App 581, 584, 927 P2d 1103 (1996), *rev den* 325 Or 369 (1997) (same). *Cf. Lutz*, 130 Or App at 287 (Haselton, J., concurring) ("No one was 'sandbagged.' No one is operating under any illusions.").

■ Consideration of defendant's *Johns*-based arguments also comports with the second paramount preservation principle: fair opportunity for record development. That is so for two reasons. First, the state, as proponent of the evidence under OEC 404(3), bore the burden of establishing the requisite foundation under *Johns. See Mayfield*, 302 Or at 645. Thus, upon being alerted to defendant's concerns, the state had a fair opportunity to make the necessary foundational showing. Second, we are unpersuaded that a more particular objection would have—indeed, could have—materially affected the development of this record with respect to at least one of *Johns'* conjunctive criteria. In particular, with respect to the third ("same class of victim") criterion, we do not perceive, and the state does not suggest, how the opportunity for further record development could have altered the salient facts.

■ We proceed then to the merits of the trial court's admission of those portions of the videotaped interview relating to defendant's incestuous relationship with his stepdaughter and, particularly, whether the incest-related evidence satisfied the second through fifth *Johns* criteria. As noted, the failure of *any* of those criteria compels exclusion. *See Pratt*, 309 Or at 211; *Rinkin*, 141 Or App at 368. Without addressing each factor, we conclude that the incest-related evidence did not satisfy either *Johns'* third, "same class of victim" or fifth, similar "physical elements" criteria.

---

[8] More than 50 reported Oregon decisions have addressed *Johns'* application to "prior bad acts" evidence under OEC 404(3).

"C" was a six-year-old girl who was unrelated to defendant. The victim of the prior misconduct was a member of defendant's family, who was 14 and post-pubescent at the time the incestuous relationship began ("14 going on 21" in defendant's description) and 28 when it ended. Although both could, most broadly, be described as members of a class of females in defendant's care,[9] we believe that, given the general nature of the allegations here, the differences in age, degree of physical development and maturity, and relationship to defendant consign "C" and defendant's stepdaughter to different classes for purposes of the *Johns* analysis. *See State v. Walters*, 99 Or App 570, 573, 783 P2d 531 (1989), *rev'd on other grounds* 311 Or 80, 804 P2d 1164, *cert den sub nom Walters v. Oregon*, 501 US 1209 (1991) (13-year-old complainant and 13-year-old victim of prior rape "were of similar age, degree of maturity and vulnerability and, therefore, were in the same class"). Our conclusion in that regard comports with the significance of age—and, by extension, physical and emotional maturity—in the statutes under which defendant was charged. With the exception of the criminal mistreatment charge, ORS 163.205, those statutes treat age as a material element and, particularly, distinguish between conduct towards persons who are younger than 12 (or 14) and those who are older. *See, e.g.,* ORS 163.375(1)(b) (rape in first degree includes intercourse with person under 12 years of age); ORS 163.411 (unlawful sexual penetration in first degree includes penetration of person under 12 years of age); ORS 163.427 (sexual abuse in first degree includes subjecting person less than 14 years of age to sexual contact). *See also* ORS 163.375(1)(c) (treating stepchild relationship as material element where victim is under 16 years of age).

■ We further, and alternatively, conclude that the incest-related evidence did not satisfy *Johns'* fifth, similar "physical elements" criterion. With respect to the incest, the record discloses only that defendant, at various times over a 14-year period, engaged in intercourse with his stepdaughter. There is no suggestion that that ongoing intra-familial relationship involved applying lotion, bathing together, or

---

[9] *See State v. Dibala*, 161 Or App 99, 105, 984 P2d 302 (1999) (in two incidents involving sex abuse, victims, who were seven and 12, were in the same class of victims because they were close in age and were "children in the defendant's care").

any of the other physical elements underlying the present charges. Because the state failed to establish the requisite similarity, the court erred in admitting the incest-related evidence.

The state contends, nonetheless, that any error was harmless. Evidentiary error is harmless if there is little likelihood that the error affected the verdict. *See, e.g., State v. Phillips*, 314 Or 460, 471, 840 P2d 666 (1992); *see also* OEC 103(1). After reviewing the entire record, we agree with the state that the admission of the incest-related portions of the videotape was harmless with respect to the sex abuse charges. However, we further conclude that the error was not harmless with respect to the rape, unlawful sexual penetration, and criminal mistreatment charges.

■ We begin with the sex abuse charges. The gravamen of those charges was that defendant touched "C's" vagina for purposes of sexual gratification. We fully appreciate the inflammatory potential of incest-related evidence in that context. Nevertheless, given defendant's admissions, we believe that there is little likelihood that that evidence affected the jury's verdict. In particular, in addition to hearing "C's" testimony detailing defendant's conduct, the jury heard defendant's videotaped admissions, which he did not dispute, that he had repeatedly put lotion on "C's" "butt and down in her crotch"; that he had bathed naked with "C" on "four or five occasions"; that he had slept with her in his bed; and that he had told her that that conduct would be their "secret." Given those admissions, the evidence was so overwhelming that any reasonable juror would have concluded that the conduct occurred and that defendant acted for a sexual purpose.

■ Conversely, we conclude that the admission of the evidence was not harmless with respect to the remaining charges. The gravamen of the unlawful penetration charge was that defendant digitally penetrated "C's" vagina. The gravamen of the criminal mistreatment charge was that defendant caused physical injury to "C" by digitally penetrating her anus or vagina. In contrast to defendant's admissions of the touching that underlay the sex abuse charges, he explicitly and vehemently maintained that there had been

"no insertion." That denial directly contradicted "C's" testimony that defendant touched her "inside" her vagina with "his privates and his finger," and that he hurt her by "moving it around." Moreover, as the defense emphasized, the prosecution presented no expert medical testimony corroborating intercourse or penetration of the vagina or rectum. Thus, the proof on the rape, unlawful penetration, and criminal mistreatment charges essentially reduced to a "swearing match" between "C" and defendant.

Given those circumstances, and the prejudicial potential of the incest-related evidence, we cannot say that there was "little likelihood" that the error in admitting that evidence affected the jury's all-important assessment of credibility. Consequently, defendant's convictions for rape, unlawful sexual penetration and criminal mistreatment, must be reversed and remanded for a new trial.

■ We proceed to defendant's two remaining arguments to assess whether they warrant reversal of the sexual abuse charges. The first of those arguments challenges the trial court's admission of that portion of the videotape mentioning possible abuse of defendant's son. The entire videotaped reference to that matter was as follows:

"Q. A couple years ago there was * * * I found a file involving [your son] where I guess, um, it was reported that around his anus there was some redness. Do you remember that?

"A. Yeah.

"Q. Can you tell me about what was involved?

"A. Nothing to do with any kind of sex that I know of.

"Q. Have you ever touched each other?

"A. No.

"Q. Have you ever inserted your [inaudible] into him?

"A. No.

"Q. Would you ever do anything like that?

"A. No.

"Q. Well, I gotta ask, okay?

"A. Okay."

Defendant contended that that colloquy was inadmissible under OEC 404(3) and reiterates that argument on appeal. The state responds that the colloquy was so indefinite—*i.e.*, it did not establish that defendant had, in fact, engaged in misconduct but, rather, concluded with his denial—that it was not "evidence of other crimes, wrongs, or acts." The state further argues that the colloquy was so cursory in the context of the entire videotape that its admission was, at worst, harmless error.

Assuming, without deciding, that that portion of the videotape was improperly admitted under OEC 404(3), we conclude that any error was harmless. Given the overwhelming evidence on the sex abuse counts, *see* 162 Or App at 523, there was little likelihood that the colloquy affected the verdict on those charges.

 Finally, defendant challenges the admission of that portion of the videotape in which Moore spoke on the telephone with a third party, discussing the possibility of that person taking a polygraph in an unrelated matter.[10] From Moore's side of the conversation, one cannot tell the nature of the other matter. Defendant argues on appeal, as he did to the trial court, that the polygraph discussion was inadmissible as irrelevant, OEC 401, and, alternatively, that it was more prejudicial than probative. OEC 403.

We agree with defendant that, even under the benign standard of relevancy articulated in OEC 401,[11] the

---

[10] The relevant portion of that conversation is as follows:

"Now, we had a discussion * * * about your case and the district attorney is going to get a hold of the ones in Pasco 'cuz they're pretty upset. Now you guys are willing to take a polygraph, right? (pause) Okay, 'cuz I want to set up one, up for everybody. Okay? I just gotta wait three more weeks so we can have another * * * meeting to find out what they found out in Pasco. Okay? So I was gonna call ya and tell ya that. I'll let you know what's going on. Besides that, what else is going on? (pause) Well, within the next three weeks. * * * Like I told your stepson, I want those little girls interviewed * * * what happens if he just fell? * * * Get those kids in to interview. It might solve a whole lot of problems. Maybe you won't have to take a polygraph."

[11] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

polygraph discussion between Moore and the unidentified third-party caller was not relevant to defendant's case and, consequently, should have been excluded. Indeed, given its location on the videotape—free-standing, without being intertwined with any substantive discussion—it could easily have been bypassed. Nonetheless, the error was harmless.

*State v. Neal*, 143 Or App 188, 922 P2d 717, *rev den* 324 Or 488 (1996), is instructive. There, the defendant moved for a mistrial when an officer testified that he had interviewed the defendant in the "polygraph room." The trial court denied defendant's motion, and, on appeal, the defendant argued that the mere reference to the polygraph was enough to cause the jury to speculate " 'why * * * [the defendant] did not take and pass the polygraph test.' " We rejected that argument, considering several factors in our assessment of the evidence:

> "The admission of polygraph evidence may constitute reversible error if it is used to undermine, buttress or rehabilitate a witness's credibility. However, a mistrial is not required where the reference to a polygraph is an isolated statement, made merely in passing, does not disclose the results of the examination, and is not later alluded to by the prosecutor." *Id.* at 193.

Here, the polygraph references were even more innocuous than those in *Neal*. Unlike the reference in *Neal* to the defendant being in the "polygraph room," which could imply that the defendant must have been in that room to take a polygraph, none of the polygraph references here related to defendant. We note, moreover, that the prosecutor here did not subsequently refer, either explicitly or implicitly, to that aspect of the videotape. The error was harmless.

Reversed and remanded for new trial on count I (rape in the first degree); counts II and III (unlawful sexual penetration in the first degree); and count VI (criminal mistreatment in the first degree); otherwise affirmed.