Argued and submitted October 4, 1989, the judgment of the circuit court reversed and
case remanded to the circuit court for a new trial January 11, 1990

# STATE OF OREGON,
*Respondent,*

*v.*

# JESSE CLARENCE PRATT,
*Appellant.*

## (TC 86-328 CR; SC S34964)

785 P2d 350

Donald A. W. Piper, Judge.

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause and filed the brief for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent. With her on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, Diane S. Lefkow, Assistant Attorney General, and Brenda J Peterson, Assistant Attorney General, Salem.

GILLETTE, J.

## GILLETTE, J.

This criminal case is before us on defendant's automatic direct appeal of his judgment of conviction and sentence of death for two counts of aggravated murder. We reverse both the conviction and the sentence of death and remand for a new trial.

## THE CRIME

Defendant was charged with two separate counts of aggravated murder of Carrie Love. One count alleged that he murdered Love in the course of attempting to rape her. The other count alleged that he murdered her in the process of maiming her.[1]

The following facts could have been found by the jury. Defendant operated a long-haul trucking service, North

---

[1] ORS 163.095 provides:

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"(1)   * * *

"(e)   The homicide occurred in the course of or as a result of intentional maiming or torture of the victim.

"* * * * *

"(2)   * * *

"(d)   Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in 163.115(1)(b)."

ORS 163.115(1) provides:

"Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"* * * * *

"(b)   When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:

"* * * * *

"(H)   Any felony sexual offense in the first degree defined in this chapter."

ORS 163.375(1) defines rape in the first degree:

"A person who has sexual intercourse with a female commits the crime of rape in the first degree if:

"(a)   The female is subject to forcible compulsion by the male."

Star Trucking, in the Seattle area. Love was an employee of defendant's. She agreed, despite some misgivings, to ride from Seattle to Los Angeles with defendant in his truck. The purpose of the trip was to set up a new Los Angeles office of North Star Trucking. Love was to assist in this project. She would also visit her father who lived in Los Angeles. Love was concerned that defendant would make a sexual pass at her, but she had assured her boyfriend that, if he did, she would get out of the truck and call the boyfriend.

After defendant and Love left Seattle on June 16, 1986, Love was never heard from again. On June 17, a passerby found a sleeping bag and a pillowcase by the side of Highway 97 north of Klamath Falls. The pillowcase contained Love's purse. The sleeping bag was soiled with feces, blood, and semen. The passerby turned the purse over to the police, who began a search for Love. Using phone numbers found in Love's purse, the police contacted North Star Trucking and one of Love's friends. They learned that Love had left Seattle with defendant in defendant's truck.

Love's nude body was found on June 18 about 25-30 miles from the location where her purse had been found. She had been stabbed repeatedly and run over by a vehicle.

On June 19, two police officers came to North Star Trucking's office. Defendant, who was still on the road, happened to call in while the police were there. The officers told defendant that Love was dead and questioned him about the circumstances of the trip. Defendant told them he was on his way to Phoenix and would be returning to Seattle in a few days. He also described his truck to the officers. Based upon that description, defendant was stopped and arrested later that day by an Arizona Highway Patrol officer.

Defendant told police officers different stories. First, he told the officers that Love had changed her mind about driving south with him so he dropped her off near the Seattle airport. Later he admitted that Love had accompanied him in his truck. According to this version, the two of them had consensual intercourse. Shortly thereafter, Love admitted to stealing from defendant, so he threw her out of the truck and never saw her again. He denied killing or raping her.

Semen was found in Love's vagina, but it was never

tested. The semen in the sleeping bag was tested and determined not to belong to defendant. This semen was compatible with that of Love's boyfriend who admitted to having intercourse with Love the day before her departure.

After jury trial, defendant was convicted of both counts of aggravated murder and, based upon the jury's affirmative answers to two of the three statutory questions under ORS 163.150,[2] defendant was sentenced to death. This automatic appeal followed.

## PRETRIAL MOTIONS

Defendant made two pretrial motions which are relevant on appeal. First, defendant moved to exclude all evidence relating to a prior unrelated abduction and rape he had committed. Defendant argued that this evidence was irrelevant and prejudicial. He also moved to suppress all evidence obtained following his warrantless arrest in Arizona. Defendant contended that the arrest was illegal because the arresting officer lacked probable cause. The trial court denied both motions.

1. Evidence of Prior Crime

In 1980, defendant was involved in a relationship with Teresa Lewis. Lewis lived with defendant for 45 days until she grew fearful of him and moved out. Defendant continued his pursuit of Lewis to the point where she felt harassed and reported defendant to police.

On August 5, 1980, David Whaley entered Lewis' place of business in Seattle, Washington, and pulled a gun. Defendant came in a few minutes later. He bound and gagged Lewis' fellow employees with duct tape and paper towels. The two intruders then took Lewis out of the office and south into Oregon on highway I-5. They stopped at a motel near Eugene. Defendant and Lewis took one room while Whaley rented another. Later that same day, at defendant's instruction, Lewis had forcible sexual intercourse with Whaley while defendant watched. Later, defendant forced Lewis to have sex with him twice.

---

[2] The third statutory question, concerning provocation, was not submitted to the jury, presumably because there was no evidence of provocation by the victim.

The following day Lewis was able to get away from defendant for a few minutes and enter a woman's restroom. She asked a woman there to contact the police because she was being held against her will. Sometime later that day, police officers arrived and arrested defendant.

Aggravated murder trials are divided into two phases, the guilt phase and the penalty phase. Defendant assigns as error the trial court's decision to permit testimony concerning the defendant's prior unrelated kidnapping and rape of Teresa Lewis during the guilt phrase of his trial.[3]

Generally, evidence of other crimes is inadmissible to show the character of a defendant or his propensity to commit crimes. OEC 404(3). However, such evidence is admissible for a variety of other purposes, including proof of identity, intent, or absence of mistake. OEC 404(3) provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

In Oregon, the rule of OEC 404(3) is considered to be an inclusionary one — other crime evidence is admissible not just to prove one of the specific exceptions in OEC 404(3), but upon "any theory of logical relevance * * * that does not run afoul of the 'propensity to commit crimes or other acts' prohibition." *State v. Johns*, 301 Or 535, 548, 725 P2d 312 (1986). However, the burden is on the party offering the evidence to show that the proffered evidence is relevant and probative of something other than a disposition to do evil. In this case, Lewis's testimony was admitted solely to prove defendant's intent to commit the crime of attempted rape on Carrie Love.[4]

---

[3] The testimony clearly would be admissible in the penalty phase as relevant to question two, defendant's future dangerousness. ORS 163.150(1)(b)(B).

[4] Although the state does not now argue that this evidence was admitted to prove defendant's identity as the perpetrator of the crime, the record indicates that at trial both the state and the trial court considered Lewis's testimony relevant to that issue. It is not. To be admissible on the issue of identity the crimes must be nearly identical. The two crimes under consideration in this case are not sufficiently similar to constitute a " 'signature' crime." *State v. Johns*, 301 Or 535, 551, 725 P2d 312 (1986). In any event, the jury was instructed that it could only consider the evidence for its bearing on defendant's intent to commit attempted rape.

■■    In *State v. Johns, supra,* we discussed the process which a trial judge must use to evaluate the admissibility of prior crimes evidence offered to prove intent. First, the judge must determine whether the proffered evidence is relevant to the issue of intent. Then the judge must weigh the evidence under OEC 403[5] to determine whether its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* at 549-50. To guide trial judges in applying these standards, we listed six independent questions which the judge should ask before admitting other crimes evidence:

"(1)   Does the present charged act require proof of intent?

"(2)   Did the prior act require intent?

"(3)   Was the victim in the prior act the same victim or in the same class as the victim in the present case?

"(4)   Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5)   Were the physical elements of the prior act and the present act similar?

"(6)   If these criteria are met, is the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?"

*Id.* at 555-56.[6] The first five questions relate to the issue of relevance. Only if the trial judge is convinced that the answer to each of these questions is yes should the judge proceed to weigh the evidence under OEC 403, as reflected by the sixth question.

The trial court attempted to use the *Johns* test correctly. It asked the right questions and, based upon its affirmative answers to those questions, admitted Lewis's testimony.

---

[5] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[6] We emphasize that the *Johns* questions are only appropriate when the prior crimes evidence is offered to show intent — the issue both in that case and in this one. They are not necessarily appropriate to determine the admissibility of prior crime evidence to prove identity or any other matter at issue. Here, the jury was instructed only to consider the evidence on the issue of defendant's intent to commit the crime of attempted rape, so *Johns* states the applicable test.

However, we find that the trial court answered at least one of the *Johns* questions incorrectly as a matter of law.

The trial court stated its answers to the *Johns* questions on the record:

"On the identity issue the Court has considered the issues that were outlined in *State v. Johns, * * *.* Namely does the present charged act require proof of intent. The answer is yes, it does.

"Did the prior act of [sic] Mrs. Lewis require intent? And yes, it did.

"Was the victim in the prior act the same victim or in the same class of victims as in the present case? The court finds that Mrs. Lewis was.

"They were both acquaintances of the Defendant. They were both relatively young and relatively attractive. They had a relationship with the defendant. Mrs. Lewis as a girlfriend and Carrie Love as an employee.

"Was the type of prior act the same or similar to the acts involved in the charged crime? Well, it was similar as they both involved a sexual assault.

"The earlier act of Mrs. Lewis was somewhat different in that it was an abduction. And there isn't any evidence that there was an abduction at least at the outset in the present case.

"Were the physical elements of the prior act and the present act similar? The Court finds that they were. Both of the women were taken from the State of Washington into the State of Oregon. Both were sexually assaulted. The company workers in the earlier incident involving Mrs. Lewis were bound and gagged with duct tape. The victim in the present case was bound with duct tape. And her mouth at least was bound with paper napkins or something similar, paper towels with duct tape.

"The sixth question is the probative value of the evidence of the prior act substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, cause undue delay or presentation of cumulative evidence.

"This particular weighing process is rather strictly applied when the prior crime to be shown is a sexual crime because the tendency of such a crime to raise elements of passion and inflammatory responses with the jury.

"But the court finds that the probative value is not outweighed by the prejudicial effect. In making that determination the court considered the need for the evidence, since the victim is deceased and there is an obvious need for it.

"The certainty that the other crime was committed and that the defendant did it, the victim, herself, Mrs. Lewis is here to establish that.

"The strength or weakness of the evidence. The court finds that it is relatively strong on the intent issue. How time consuming and distracting it will be: The court finds that that consideration should be weighed in favor of receiving it.

"* * * * *

"On the issue of identity the court made the same comparisons and arrived at the same results as I have just indicated. This is evidence of modus operandi or common feature of the two crimes.

"And the court finds that they are so nearly identical in method as to ear mark the defendant as the common perpetrator of both crimes.

"In making that determination the court relies on the comment in *State v. Johns,* in 301 Oregon, the opinion in *State v. Manreck* [sic, should be *Manrique*] at 271 Oregon 201, 1975 case, *State v. Sterling,* a similar case, 22 Or App 52, a 1975 case. And *State v. Erbmon,* 54 Or App 910, a 1981 case."

We have no problem with the trial court's answer to the first two questions. Obviously, the deliberate rape of Ms. Lewis and the alleged attempted rape of Ms. Love both required the specific intent to rape. We are troubled by the trial court's answers to questions three, four, and five. However, because the trial court clearly erred in its response to question five — the question of the physical similarities between the two offenses — we need not consider its responses to the other questions.

In determining that the physical elements of the two crimes were similar the trial court points to three similarities:

1) Both victims were transported from Washington into Oregon;

2) Both victims were sexually assaulted; and,

3) During the course of each crime someone was bound and gagged with duct tape and paper towels.

These similarities do, of course, exist. However, such similarities cannot be considered in a vacuum. The circumstances of each crime as a whole must be compared. First, the trial judge must find that there are significant similarities in the physical elements of the two crimes. If that test is met, then the trial judge must consider the differences between the physical elements of the two crimes. The differences may be minimal — for example, the offender may have used different words to indicate his intent. On the other hand, the differences may be so great that they overwhelm the similarities. The point is: The dissimilarities must be as fully considered as the similarities in answering this question.

■        Determining what constitutes a significant similarity is a matter to be decided on a case-by-case basis. Some similarities are so common as to be trivial (for example, the offender spoke English during both crimes) while others may be so unusual as to be significant even standing alone (for example, the offender spoke a foreign language when he intended to rape, but spoke English otherwise). Most often the significance of the similarities will arise out of their combination.

A comparison of the two crimes in this case demonstrates that the similarities between the physical elements of the two crimes do not outweigh the differences: Lewis was publicly abducted at gunpoint by defendant, who had an accomplice. Love's murder involved no abduction, no gun, and no accomplice. Lewis was raped at a motel during a significant interruption of a trip. Love, if she was raped at all, was raped in a truck or by the side of a road. Lewis was raped, but not otherwise seriously injured. Love was brutally stabbed, asphyxiated, and run over. Even one of the similarities is questionable. In the Lewis abduction the witnesses were bound and gagged, not the victim herself as in the Love murder.[7] Aside from its tendency to show that defendant is the sort of man who commits rape, the Lewis abduction and rape is not probative of defendant's intent to rape Carrie Love.

■        The state contends that even if the admission of the

---

[7] Of course, by virtue of being bound and gagged and threatened at gunpoint, the witnesses were themselves crime victims. However, they were not victims of a sexual assault and the fact that defendant bound and gagged them does not, in and of itself, show anything about defendant's intent to commit rape.

prior crimes evidence was error, it was harmless because the error relates to only one of the two counts of aggravated murder. We reject this argument. The evidence essentially told the jury that defendant is a bad person who commits brutal crimes. This prejudicial characterization infected the entire guilt phase of the proceeding. The error requires a new trial.

2. Arrest in Arizona

In light of our disposition of this case on the evidence of the prior crime, only one other claimed error need be addressed because it will arise again on retrial. That assignment is the denial of defendant's motion to suppress all evidence arising out of his arrest in Arizona. The motion challenged not only the physical evidence seized, but all statements made by defendant to Arizona police.

Defendant was arrested in Arizona pursuant to a teletype request from Oregon that named the defendant as a suspect in a brutal homicide. The message also requested that defendant's truck be seized "for crime lab processing." Defendant was stopped and advised of his *Miranda* rights. After consultation with an attorney who advised him that the police would be able to obtain a search warrant, defendant consented to a search of his truck. The trial court ruled that there was probable cause for the arrest and that defendant had consented to the search of his truck.

The first issue is whether the legality of this stop is to be judged by Oregon law or by Arizona law. Although there could be circumstances in which such an issue might be troublesome, this is not such a case. The law of both states appears to be identical. Both states have statutes permitting a warrantless arrest when there is probable cause to believe a person has committed a felony.[8] Both parties assume that the law

---

[8] ORS 133.310(1) provides:

"A peace officer may arrest a person without a warrant if the officer has probable cause to believe that the person has committed any of the following:

"(a) A felony."

Ariz. Rev. Stat. § 13-3883 provides:

"A peace officer may, without a warrant, arrest a person if he has probable cause to believe:

"1. A felony has been committed and probable cause to believe the person to be arrested has committed the felony."

of each state is the same.

Defendant admits that the trial court's findings that Carrie Love had been murdered and that defendant was a suspect in this murder were supported by the record. His sole challenge to the arrest is based upon his contention that "[t]here was simply inadequate evidence that [the arresting officer in Arizona] had a reasonable belief [that] the Oregon officers had information sufficient to establish probable cause."

In *State v. Porter,* 31 Or App 285, 288-89, 570 P2d 396 (1977), the Court of Appeals held that probable cause:

> "is to be evaluated on the basis of the collective information of the police rather than that of only the officer who effects the arrest *as long as* the arresting officer actually acted with an awareness or reasonable belief that fellow officers had information which, either taken alone or in conjunction with the knowledge possessed by the arresting officer, was sufficient to establish probable cause."

(Emphasis in original.) Defendant assumes that *Porter* correctly states the law. He simply argues that the arresting officer in Arizona knew none of the incriminating facts known to Oregon officers but instead arrested defendant solely in reliance upon the information he had received over the teletype. Therefore, defendant argues, the Arizona officer lacked a "reasonable belief that fellow officers had information which * * * was sufficient to establish probable cause" to arrest defendant.

■■ The issue presented has never before been examined by this court. We agree with the Court of Appeals' resolution of the issue in *Porter.* A peace officer who does not himself have probable cause to arrest a felony suspect nonetheless may arrest the suspect if he *reasonably* believes that the officer or officers who have requested the arrest do have probable cause to make that arrest and if probable cause to arrest does, in fact, exist. Here the defendant concedes that the record supports the trial court's finding of probable cause. Therefore, the only remaining issue is whether a teletype message from another law enforcement agency requesting the arrest of a felony suspect is the kind of request upon which an officer reasonably may rely under this rule.

We hold that such reliance is reasonable. Officers must be able to rely on such messages from fellow officers elsewhere in order to counteract the high degree of mobility criminals enjoy in this society. To hold otherwise would either prevent emergency requests for assistance, or would require that such requests contain long evidentiary summaries which each individual officer then would have to evaluate for probable cause, perhaps while driving down a highway following a suspect.[9]

■ Defendant also challenges the voluntariness of his consent to the search of his truck. The consent was valid. Defendant was told that he could refuse to consent and he had the advice of counsel when making the decision to consent. This is not a case like *State v. Williamson,* 307 Or 621, 772 P2d 404 (1989), where the police coerced consent by threatening to detain a truck while obtaining a search warrant when they could not legally do so. Here the police had the legal right to detain the truck. Defendant had been legally stopped, the truck had been legally seized, and there was probable cause to conduct a search. The trial court properly denied defendant's motion to suppress.

## CONCLUSION

Because of our disposition of this case we are not required to consider any of defendant's other assignments of error. Most are not likely to recur on retrial and those that do can be considered upon later appeal, if defendant is reconvicted. *See State v. Isom,* 306 Or 587, 596, 761 P2d 524 (1988).

The judgment of the circuit court is reversed and the case is remanded to the circuit court for a new trial.

---

[9] We do not decide whether a warrantless arrest is still appropriate when there has been sufficient time to obtain a warrant. It may well be that the failure of police to obtain a warrant promptly when they have time to do so would invalidate an otherwise valid warrantless arrest. That issue is not presented by this case because a warrant was obtained not long after the teletype was sent out and, in any case, defendant has not raised the issue.