Argued and submitted January 19, affirmed April 16, petition for review denied August 12, 1997 (326 Or 43); supplemental *pro se* petition for review denied September 23, 1997 (326 Or 58)

## STATE OF OREGON,
*Respondent,*

*v.*

## MARGARET ANN WHITNEY-BIGGS,
*Appellant.*

(94CR-0569; CA A86920)

936 P2d 1047

Irene B. Taylor, Deputy Public Defender, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Defendant appeals her conviction for murdering her husband with a firearm. ORS 163.115. She argues, primarily, that the trial court erred in (1) excluding evidence of the decedent's physical abuse of his former wife and his children from prior marriages; and (2) admitting evidence of defendant's violent conduct toward a former husband and a former boyfriend. We conclude that the court did not err in excluding the evidence of the decedent's prior violent conduct. We further conclude that, although the court erred in admitting evidence of defendant's prior violent acts, that error was harmless. Accordingly, we affirm.

On April 1, 1994, defendant shot and killed her husband, Tom Biggs. Defendant did not deny that she killed Biggs—and, indeed, uncontroverted forensic evidence established that she fired 15 shots from a semi-automatic weapon, wounding the decedent in the hands, arm, hip, and head. However, defendant asserted that her actions were justified as self-defense or were the product of insanity or extreme emotional disturbance. The jury necessarily rejected those defenses in convicting defendant.

On appeal, defendant contends that the verdict was impermissibly affected by the court's admission of certain evidence and its exclusion of other evidence. Reasoned assessment of the substance of those arguments—*i.e.*, whether the trial court erred and, if so, whether that error was reversible—requires a comprehensive review of the record. Thus, before specifically addressing defendant's assignments of error, we recount the history of the parties' relationship and the particulars of Biggs' death.

Defendant and Biggs met and were married in June 1991, less than three years before the shooting. At that time, defendant was 48 and Biggs was 64. Biggs, who had been married twice previously, was recently widowed and wealthy, with real estate holdings and other assets in California and Oregon. Defendant, who had been married four times previously, had never held steady employment and was often without money. The marriage seemed, initially, to be happy and stable. Defendant assisted in managing Biggs'

properties in California, and, in May 1992, he made her the sole owner of his Oregon home. Biggs gave defendant various gifts, including a Lincoln Continental.

In early 1993, defendant began to express dissatisfaction with her marriage. She told a friend in March 1993 that Biggs was "abusive." When asked if Biggs hit her, defendant replied that he did not physically abuse her but that he complained constantly and was "cheap." In the spring of 1993, Steve Grissom, a painter who had been hired to work at the couple's home, witnessed an incident in which defendant became enraged with Biggs. Grissom, who was outside the house, heard defendant yelling at Biggs and "what sounded like fists landing on a body." Immediately thereafter, defendant told Grissom that "there may be violence once again" and that "she was tired of the verbal abuse and * * * if that meant that she needed to hit [Biggs], * * * it was going to be that way."

On June 2, 1993, defendant reported to a 9-1-1 operator that her husband had hit her. When the police arrived, they found defendant with a bruise on her chin and Biggs with a deep gash on his head. Defendant said that Biggs had hit her and that she had sprayed him with pepper spray and thrown a glass at him, striking him in the head.[1] It took seven staples to close Biggs' wound. The officer arrested Biggs for fourth degree assault and harassment.

On June 3, defendant filed a petition for dissolution of marriage and obtained a restraining order that ordered Biggs to move out of the home and restrained him from contacting defendant. For the next four months, defendant made numerous calls to the police, complaining that Biggs was sending her threatening letters or driving past her home. According to officers who responded to those calls, defendant's main concern was not about her safety, but that she would lose the home in the divorce. The letters that she showed the officers were not threatening but, instead, included Biggs' offers of a property settlement.

---

[1] At trial, defendant denied that she had told the officer that she threw a glass at Biggs or that the glass hit Biggs on the head. She acknowledged, however, that she threw a glass.

On June 29, 1993, defendant began visiting Dr. Robert Luther, a psychiatrist, who had treated her seven years before.[2] At that time, defendant was depressed, anxious, and fearful, both physically and with respect to her financial future. Thereafter, until early March 1994, defendant saw Luther roughly a half-dozen times, complaining of increased stress because of Biggs' conduct, and expressing fear of Biggs and concern about her financial status if the parties divorced.

In July 1993, defendant went to a gun shop. She told the proprietor that she was looking for a gun to protect herself from her husband and his nephew, both of whom she said had been harassing her. Defendant bought a MAK 90, the Chinese equivalent of an AK 47 semi-automatic rifle, and an extended clip that held 30 rounds. Defendant also kept mace, pepper spray, and two taser guns, explaining to one friend that, if Biggs ever "tried to do anything or come on the premises," the friend could use the taser gun on Biggs.

In October 1993, defendant dismissed the petition for dissolution and the restraining order, pursuant to her divorce attorney's advice. Her attorney had advised her that her marriage to Biggs was considered a "short-term marriage;" that, as such, a court would most likely not give her the home as part of the property distribution; and that, at most, she would be entitled to one-half of the appreciated value of Biggs' assets. He urged her to let Biggs move back into the home. Defendant agreed to let Biggs move back in, but only if they lived in separate parts of the home—she was to live on the upper level of the house and he could live on the lower level, which had been made into an apartment.

On October 18, 1993, defendant and Biggs executed a "reconciliation" agreement. In that nine-page document, Biggs promised, *inter alia*, to pay defendant $2,000 a month for maintaining her household, confirmed that he had previously given her gifts of $10,000 and $39,000, promised to give her $130,000 in January 1994, which he was to receive as an

---

[2] Dr. Luther had treated defendant in July 1986, when she was admitted to the psychiatric unit of a local hospital for 10 days. Defendant had threatened suicide after receiving an adverse ruling in a divorce proceeding. On defendant's discharge in 1986, Luther prescribed anti-psychotic medication, which defendant took for several months.

inheritance, promised to assume all of defendant's credit card debts, and confirmed her ownership of the Lincoln Continental and the home. Biggs also promised that, in the event of a divorce, defendant would keep all of that property. The agreement confirmed that the parties would live separately within the same house and that, if they were unable to get along, Biggs would move out and "seek another life." Defendant told a bank employee, who notarized the document, that she was staying with Biggs because "she didn't want to lose her house."

Sometime in October 1993, defendant telephoned a neighbor and explained that she had to let Biggs move back into the house, but that she was afraid of him. When asked why she did not get a divorce, defendant replied that she was afraid that the judge would decide that she was not entitled to the house. Defendant then asked the neighbor, "If I were to kill Tom do you think the police would arrest me?" The neighbor replied that "it would depend on the police." At about the same time, defendant told an acquaintance that she wished Biggs were dead.

In November, Biggs moved back into the house, on the lower floor, and defendant began to tape record their conversations as well as their other interactions. She often asked people to listen to the tapes as proof of the "abuse" and "harassment" that she "had to put up with." Although the tapes included some name-calling, they did not record physical abuse or threats of abuse. Although defendant often complained about Biggs during this period, she never asserted that he was physically abusing her. A continuing source of conflict was defendant's attempts to purchase a four-plex without Biggs' knowledge and her subsequent efforts to persuade, or compel, Biggs to deed over to her the entire ownership of another four-plex that the couple was purchasing.

In January 1994, defendant went to the Josephine County Courthouse to seek a restraining order against Biggs, who was still living on the first floor of the house they shared. When a clerk asked defendant whether she had been subjected to physical abuse or threats of abuse during the prior

six months, defendant replied that she had not been physically abused, but that Biggs was harassing and "stalking" her by following her around and that it caused her "great anxiety." Ultimately, defendant did not apply for a restraining order.

At about that time, in early 1994, Biggs' physical condition deteriorated markedly. He walked very slowly, shuffling his feet instead of picking them up. His nephew's wife noticed that his hands would shake when he ate. The owner of a mailbox rental service where Biggs picked up his mail noted that, when he had first met Biggs, Biggs had been very talkative and outgoing, but that he had become very quiet and introverted. He observed that, when defendant was with Biggs, Biggs seemed to follow her "like a puppy." Many witnesses characterized defendant as the dominant personality in the relationship.

On March 11, defendant had her last session with Luther, the psychiatrist. At that time, she complained that Biggs was "banging on doors and yelling at her." She told Luther, "He's trying to kill me with stress."

In mid-March, defendant called a friend, Hopper, and said that her nerves were "shot" because Biggs was constantly harassing her. She asked Hopper, "What do you think would happen if I'd snap and shoot him?" Hopper replied that defendant "would probably be arrested and go to jail."

On March 19, defendant bought a semi-automatic handgun from a pawn shop. She expressed an interest only in "very small concealable type handguns" and told the proprietor that she lived by herself in the country and needed the weapon for protection. Defendant was to pick up the gun on April 4.

On March 28, four days before the shooting, defendant went to a bank with a $50,000 check from Biggs. She asked if Biggs' account had sufficient funds to cover the check and whether he could stop payment on it. When the teller suggested that, if defendant cashed the check for a cashier's check, Biggs would not be able to stop payment, defendant asked her to do so, endorsing the check with the notation that

it was a "gift" from Biggs. In fact, it appears that Biggs gave defendant the $50,000 check in conjunction with the purchase of the four-plex.[3]

Also on March 28, defendant called the police, complaining that Biggs was harassing her by making noises. An officer told defendant that she could apply for a restraining order. When defendant subsequently did so, she acknowledged to a court clerk that she had not been subjected to physical abuse or threats of physical abuse within the prior six months, but asserted that Biggs was harassing her by banging on the walls and making noise. The clerk told defendant that her application was "inappropriate."

On March 30, the court denied defendant's application for a restraining order. Thereafter, defendant spoke to Captain Pendergrass of the Josephine County Sheriff's Office, saying that she had "no place to turn." Defendant, who was "very agitated," and "very angry," told Pendergrass that she wanted Biggs to move out and that she wanted the house. Pendergrass described the exchange:

> "[S]he basically said if something wasn't done she would have to take matters into her own hands and resolve the problem herself.
>
> "* * * * *
>
> "I admonished her. I told her that, you know, number one, she didn't need to take matters into her hands, that if she took matters in her hand it would cause us to take actions and that she would regret it and that, you know, for the rest of her life she would be regretting any action she took and I told her that she shouldn't be doing this."

After a short break, Pendergrass and defendant had a second conversation, which he described:

> "One of the first things I asked her is if she felt that she was being, that her physical well-being was in danger. I

---

[3] Later on March 28, defendant returned to the bank, upset that the cashier's check had a notation that the check was a "replacement check" and listing Biggs' account number. Defendant wanted a replacement cashier's check without any reference to Biggs on it. Defendant eventually went to another bank that agreed to replace the cashier's check without the notation indicating Biggs as the source of the funds.

asked her that if she felt her husband would assault her or harm her or that she, or did she feel that he may assault her or harm her. She stated no, that since the first incident that he had not physically abused her in any way. His abuse was mental, mental and harassment on her.

"* * * * *

"Throughout this conversation she was not as emotional as the first one. But she did, again, at times become very frustrated with the system, with what was occurring in her life and stated that if someone didn't do something she'd have to take action into her own hands. Again I just admonished her stating that she should not do that, she should not cause us to have to take any action against her, or that she should not do anything that would cause criminal action. She would regret that."

On March 31, Biggs visited the mortgage broker who was handling the purchase of the four-plex. He showed the broker the $50,000 check that defendant had endorsed, and he was "animated" about defendant's notation on the endorsement as a "gift." Biggs told the broker that he was not sure whether he would deed the four-plex to defendant once the transaction was final. That night Biggs called his granddaughter and told her that he might keep his name on the deed to the four-plex.

On the evening of March 31, according to defendant, Biggs confronted her and told her, "I'm not going to give you the four-plex * * *. You can't have the four-plex and you can't have the house and you can't have a divorce. * * * You won't live to see the end of a divorce." According to defendant, Biggs then grabbed her by the collar and neck and pushed her. Defendant was, by her own account, "scared" and later took "a few" Valium and Xanax, a prescription tranquilizer.

Defendant shot and killed Biggs some time between 9:30 and 9:40 on the morning of April 1. At about 8:00 that morning, defendant called an acquaintance and said that she and Biggs had been fighting again and that "she just wanted to know if I was going to stab her in the back." At 8:15, she called her friend, Hopper, saying that she was upset because Biggs was yelling at her to go to breakfast with him and she did not want to go. Hopper told her to not go with him.

Biggs left the house alone at about 8:30, walking his two dogs. At about 9:00, Biggs entered the business where he rented a mailbox. At 9:13, he was at a Safeway store where he bought, among other things, donuts for himself and for defendant.

At 9:15, before Biggs returned, defendant called Hopper again and said, in an "extremely calm" voice, "Remember if something happens to me, you promised to take care of my babies[, *i.e.*, dogs]. Goodbye." Some time around 9:20, Biggs returned to the house.[4]

According to defendant, the following then transpired: When Biggs arrived home, he went upstairs to her part of the house and gave her some donuts. They began to argue about the $50,000 check, the four-plex, and a vacuum cleaner, which he felt he should have in his apartment. She told him that she was getting a divorce. He responded that she would not get a divorce while he was alive. He then grabbed her by the hair and punched her two or three times, took the vacuum cleaner, and started walking down the stairs to the first floor. She heard him say something about coming back to "finish the job," heard him mutter, "I'll kill you[,] I'll kill you," and saw that he had a knife. She took the MAK 90 semi-automatic rifle and, while standing at the top of the stairs, shot Biggs as he stood near or at the bottom of the stairs.[5] After the shooting, defendant, by her own admission, took the vacuum from next to Biggs' body, washed the vacuum cleaner,[6] and put it in her own part of the house, washed her hands and face, and called 9-1-1.

---

[4] The store was between a five- and ten-minute walk from the house.

[5] At trial, defendant testified:

"I was so scared. I didn't want, I never—it never entered my mind to shoot Tom. I just, I reached over and I got the rifle in the bathroom, right on the other side of the doorjamb, and I was, I guess I just got it to hold or something. And I didn't mean to shoot him. But by the time I got back and stood there he was coming back in the door, coming back through the door. And he started—he was coming back up and he had a knife in his hand and he was coming at me with the knife and I was so scared. I don't remember shooting him. But I did."

[6] Defendant could offer no explanation for washing the vacuum cleaner. At trial, the prosecution suggested that she did so to eliminate incriminating evidence: "[H]aving a vacuum cleaner down there at the scene right next to him is not very consistent with regard to some crazed maniac who's going to come back and kill her."

When the police arrived, they found Biggs' body at the bottom of the stairs. Between the ring finger and little finger of one of Biggs' hands were some hairs, which proved to be defendant's. A steak knife was lying next to Biggs' body. At the top of the stairs, the police found the rifle; they also found 15 spent shell casings.[7] On the wall next to the stairway, and continuing down the stairway, were marks and indentations that were consistent with the size and shape of ejected shell casings.

The left side of defendant's face was bruised and swollen. In an interview at about 10:00 on the morning of April 1, defendant made the following statements:

"Q: Margaret, do you want to tell me what happened?

"A: [By defendant] It was me or him.

"Q: Okay. Well, you need to tell me what happened, okay?

"A: I'm not sure. So much—I told him—I told him I was keeping his $50,000 for a four-plex, and he—he said, 'No, you're not,' and he hit me.

"Q: Where did he hit you Margaret?

"A: Right in the face. He had a knife. I remember seein' a knife and I got scared (crying).

"Q: Okay.

"A: And we—(sobbing) I grabbed the gun and just kept shooting. I just (crying) kept shooting him. I went down and looked at him and I realized what I had done and I—I washed my face and my hands and I ran out the back door.

"* * * * *

"A: I was scared, I was frightened, it was him or me. I was frightened.

"Q: When you had your argument with him and he hit you, you said he hit you in the face?

"A: Yes and he grabbed my hair."

---

[7] The rifle had seven rounds remaining in the magazine and one in the chamber.

Compelling forensic evidence indicated that, although defendant initially shot at Biggs from the top of the stairs, she continued firing the semi-automatic weapon, approaching Biggs after he was wounded in the hands, arm, hip, and head, as she descended the stairs. The evidence indicated that defendant fired the final lethal shots at close range, shooting Biggs several times in the head as he lay prone.

Compelling forensic evidence also belied defendant's account that Biggs had a knife in his hand and had pulled her hair. The blood spatter pattern was consistent with the knife being placed next to Biggs after the shooting had occurred.[8] Similarly, although tufts of defendant's hair were found between Biggs' little finger and ring finger, that hair, while forcefully removed by someone, was loose and did not evince the sort of blood droplet drying that would be expected if the hair had been in Biggs' hand at the time of the shooting.

With respect to the bruising and swelling of defendant's face, there was evidence suggesting, but not conclusively demonstrating, that those injuries were self-inflicted. A physician testified that defendant's face bruises easily, and her former boyfriend testified that defendant once told him that she could self-inflict bruises: "All I have to do is bang myself, you know, and I can get a bruise any time I want to." The doctor who treated defendant after the shooting stated that the area of the bruise and its size were inconsistent with—*i.e.*, much more severe than—what one would expect given defendant's relatively minimal collateral injuries.[9]

Defendant was charged with murder with a firearm. ORS 163.115. The case was tried to a jury over four weeks in October and November 1994.[10] The state's theory, as summarized in closing argument, was that defendant had killed

---

[8] At trial, the state's blood spatter expert testified:

"If the knife blade had been in that position it would have shattered the blood spatter pattern and we wouldn't see those streaks on the right-hand side of the blade. The blood would have been stopped by the knife blade. So that pattern on the floor where the streaks are would have to be deposited first, then the knife blade placed down over the top."

[9] For example, given the severity and extent of the bruising, the treating physician expected to find evidence of fractures or lacerations, but there were no such injuries.

[10] Ninety-three witnesses testified, and 213 exhibits were admitted.

Biggs intentionally, perhaps in a rage, because Biggs would not deed the four-plex to her and because his death would benefit her financially.[11]

Defendant raised four alternative defenses: (1) guilty except for insanity, as the result of a mental disease or defect, ORS 161.295;[12] (2) inability to form the intent to kill, due to a mental disease or defect, ORS 161.300;[13] (3) extreme emotional disturbance, ORS 163.135; ORS 163.118(1);[14] and

---

[11] The prosecutor argued:

"And she states that her options, her dollar options, her financial options are gone. They argue and there may have been an altercation. * * * There may have been some physical aspects of the interaction at that point. They argue and he leaves with the vacuum cleaner and she either in a rage, because she's so mad at him with regard to his breaking his promises and taking the vacuum cleaner, either in a rage, rage alone or a rage with an underlying plan that his death is going to get her the house and the $50,000 check that she still has, the cashier's check and all the benefits of the living trust, either a rage alone or a rage with that plan, she kills him."

[12] ORS 161.295 provides:

"(1) A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

"(2) As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

[13] ORS 161.300 provides:

"Evidence that the actor suffered from a mental disease or defect is admissible whenever it is relevant to the issue of whether the actor did or did not have the intent which is an element of the crime."

[14] ORS 163.135(1) provides:

"It is an affirmative defense to murder for purposes of ORS 163.115(1)(a) that the homicide was committed under the influence of extreme emotional disturbance when such disturbance is not the result of the person's own intentional, knowing, reckless or criminally negligent act, and for which disturbance there is a reasonable explanation. The reasonableness of the explanation for the disturbance shall be determined from the standpoint of an ordinary person in the actor's situation under the circumstances as the actor reasonably believes them to be. Extreme emotional disturbance does not constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

ORS 163.118(1) provides, in part:

"Criminal homicide constitutes manslaughter in the first degree when:
"* * * * *

"(b) It is committed intentionally by a defendant under the influence of extreme emotional disturbance as provided in ORS 163.135. The fact that the

(4) self-defense, ORS 161.209.[15] Underlying those defenses were several interlocking factual propositions: Immediately before the shooting, Biggs threatened defendant with serious injury or death, and defendant reasonably believed that he would act on those threats; defendant was a victim of abuse who was suffering from post-traumatic stress syndrome; and, at the time of the shooting, defendant's judgment and ability to form an intent were impaired both because of the stress syndrome and because she was still under the effects of Xanax and Valium that she had taken the night before.

At trial, defendant testified that Biggs had regularly physically, psychologically, and sexually abused her and threatened her and that he had become increasingly irrational. She further testified that, because of that irrationality, the previous history of abuse, and Biggs' actions immediately before the shooting, she could no longer think clearly at the time of the shooting.

Defendant presented the testimony of Luther, the psychiatrist, who testified that, throughout the period he treated defendant from June 1993 to early March 1994, she was anxious, under stress, and fearful, both with respect to her physical well being and her financial future. Luther diagnosed defendant as having a "depressive neurosis," which had become worse since the shooting. He also opined that defendant sometimes exhibited some of the symptoms of a post-traumatic stress disorder and stated that she was under "a considerable amount of stress" at the time of the shooting.

On cross-examination, Luther acknowledged that he had testified in a pretrial proceeding that, as of April 1, 1994,

---

homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing the homicide which would otherwise be murder to manslaughter in the first degree and need not be proved in any prosecution." '

[15] ORS 161.209 provides:

"Except as provided in ORS 161.215 and 161.219, a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose."

defendant did not have any mental disease or defect sufficient to support an insanity defense. He further acknowledged that, as of April 1, 1994, defendant did, in fact, have a substantial capacity to appreciate the criminality of her conduct and to conform her conduct to the requirements of the law—although her emotional condition had a "substantial input" on that capacity[16]—and that defendant had the general capacity to "form the intent to do things" and to "focus on a goal." Luther agreed that defendant was prone to "very volatile mood swings" and acknowledged, finally, that several months after the shooting, defendant told him that she would "rather die than be in prison or free but be broke."[17]

Defendant also presented the testimony of Lenore Walker, a psychologist with a speciality in treating abused women. Walker opined that, at the time of the shooting, defendant was suffering from "battered woman syndrome," which Walker described as a species of post-traumatic stress syndrome, resulting from a history of psychological and physical abuse, including by Biggs, and that her actions were a product of her psychological condition. Walker concluded:

> "She had no intention of killing Mr. Biggs. There's no evidence that I have seen that suggests that at all. Mr. Biggs is the one who continued to abuse her. Mr. Biggs is the one who came to the, entered into the upstairs part of the house where he had agreed not to go and not to be, and he is the one who threatened to kill her, threatened her, so that she became terrified. She would, my professional opinion, she would never have picked up a gun, nor would she

---

[16] On re-direct, Luther explained:

"* * * I think, that to a large extent she can form the intent. But this is colored somewhat by her pathology."

[17] In the same session, defendant told Luther that, at the time of the shooting, she "had no other option." On cross-examination, the prosecutor and Luther sparred over the significance of that comment:

"Q: [By the prosecutor] So really what she said was, I have no other option than to kill him so I can keep the house and the four-plex; isn't that basically what you're saying?

"A: [By Luther] Well, that would be one way of interpreting it. I don't know what to do because of my problems, because of my ineffectiveness, because of my distress, my fear. You could also read it, you know, that either I'm going to be dead or he's going to be dead. You can read it that way, too."

have shot at him had she not been terrified because of his behavior.

"* * * * *

"* * * She had a right to kill him, in my opinion, because she was defending herself from what she believed was an imminent attack by Mr. Biggs and threats to kill her."

The state countered with the testimony of Dr. Michael Sasser, a psychiatrist, and Dr. Alice Brill, a clinical psychologist. Both offered opinions that defendant had not experienced post-traumatic stress syndrome; that, instead, she exhibited a mixed personality disorder with antisocial, narcissistic, and histrionic components; and that, at the time of the shooting, she had the capacity to form intent, to appreciate the criminality of her conduct, and to conform her conduct to the requirements of the law. Brill, who specializes in domestic violence, testified that defendant did not show the personality characteristics ordinarily common to battered women. She concluded that defendant was a "dangerous person" with a great potential for violence, whose "major problem is anger, not depression."

The jury, after deliberating briefly, convicted defendant of murder with a firearm. The trial court imposed a 25-year minimum sentence.

Defendant raises three assignments of error on appeal: (1) The trial court improperly admitted evidence of her alleged violent conduct towards persons and property of a former husband and a former boyfriend. (2) The court improperly excluded evidence of Biggs' alleged abusive conduct towards his second wife and towards his children from a prior marriage. (3) The court erroneously refused to give defendant's requested instruction concerning Biggs' alleged propensity for violence. For clarity of analysis, we begin with defendant's second assignment.

Defendant's second assignment of error challenges the court's exclusion of testimony by two witnesses: Dr. Clara Johns, who had treated Biggs' second wife, Adrienne, during that marriage; and Tom Biggs, Jr., Biggs' son from his marriage to his first wife, Betty. Johns would have testified that, on specific occasions, Adrienne Biggs suffered injuries that

were consistent with spousal abuse. Biggs, Jr., would have testified as to particular incidents in which his father physically abused him. He would also have recounted the details of particular incidents of domestic violence he had witnessed over the course of his father's 31-year marriage to Adrienne. Defendant argued that that testimony should have been admitted under either OEC 404(1) or OEC 404(2)(b).[18] In particular, defendant argued that that evidence related to her claim of self-defense and, particularly, to the likelihood that Biggs was, in fact, the aggressor at the time of the shooting.

The trial court excluded the "prior bad acts" evidence, concluding: (1) Biggs' alleged propensity for violence was not an "essential element of a charge, claim, or defense." OEC 404(1). (2) Although defendant's state of mind was an essential element of her claim of self-defense, the incidents that Johns and Biggs, Jr., described were not relevant to defendant's state of mind because she did not know of any of those specific incidents as of April 1, 1994. (3) Although OEC 404(2)(b) expressly contemplates the admission of character evidence to show that "the victim of the crime" "acted in conformity therewith on a particular occasion," the evidence admissible under that rule does not include proof of specific instances of conduct by the alleged victim.

Conversely, although the court excluded those aspects of the Johns and Biggs, Jr., testimony that pertained to specific instances of conduct, it permitted the defense to present considerable other testimony about Biggs' violent and abusive character and about particular instances of violence. That evidence fell into three broad categories. First, defendant presented testimony from friends, neighbors, and acquaintances that Biggs was, in their opinion, violent and aggressive. Indeed, Biggs, Jr., while precluded from testifying as to particular instances of conduct, told the jury that his father was "very volatile, could be very ballistic" and had a "mean" temper.

Second, defendant testified at length about instances in which Biggs had physically, psychologically, or

---

[18] Defendant also briefly referred to OEC 404(3) but never developed a reviewable argument or evidentiary record as to admissibility under that provision.

sexually abused her. Others testified that defendant had told them of such abuse.

Third, the defense presented evidence pertaining to Biggs' alleged prior violent conduct that defendant knew about as of April 1, 1994. The trial court admitted that evidence as relevant to defendant's state of mind at the time of the shooting. Thus, not only did defendant testify that Biggs had told her that he had caused Adrienne's death, but the defense also presented the tape of a June 1993 telephone conversation between defendant and Biggs' daughter in which the daughter said that her father was unstable and "mean" and that he had beaten Adrienne.

■ We conclude that the trial court acted properly in excluding those portions of the Johns and Biggs, Jr., testimony that described particular incidents of violent conduct. The admissibility of such evidence is governed by OEC 404 and OEC 405. OEC 404 provides, in part:

"(1) Evidence of a person's character or trait of character is admissible when it is an essential element of a charge, claim or defense.

"(2) Evidence of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:

"* * * * *

"(b) Evidence of a pertinent trait of character of the victim of the crime offered by an accused[.]

"* * * * *

"(3) Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

OEC 405 provides the methods by which character may be proven:

"(1) In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the

form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

"(2)(a)  In cases in which character or a trait of character of a person is admissible under [OEC 404(1)], proof may also be made of specific instances of the conduct of the person.

"(b)  When evidence is admissible under [OEC 404 (3)], proof may be made of specific instances of the conduct of the person."

The evidence that defendant offered involved specific instances of violent conduct by Biggs. Thus, it was admissible under OEC 404(1) only if Biggs' violent nature was "an essential element of * * * a * * * defense." Defendant argues that Biggs' violent nature was an essential element of her self-defense defense. The state counters that the particular instances recounted by Johns and Biggs, Jr., could pertain to self-defense only if defendant had been aware of those specific acts on April 1, 1994—that is, only if they could potentially have affected her state of mind at the time she shot Biggs. It is undisputed that defendant did not know about those specific instances of conduct at that time. Consequently, the state asserts that OEC 404(1) does not apply. We agree. *See, e.g., State v. Lunow*, 131 Or App 429, 885 P2d 731 (1994).

In *Lunow*, the defendant was convicted of assault in the fourth degree, notwithstanding his claim of self-defense. He assigned error, *inter alia*, to the trial court's exclusion of his testimony that, a few days before the incident that resulted in his conviction, the alleged victim "had hit him three times with her cast, knocking him to the floor." *Id.* at 434. We held that the evidence of the complainant's prior aggressive conduct toward the defendant should have been admitted, not because it demonstrated the complainant's violent propensities, but because it was probative of "the reasonableness of [the defendant's] belief that [the complainant's] conduct was an attack that required him to use force":

"The plain language of OEC 404(1) permits evidence of a person's character when it is an essential element of a defense. 'Reasonable belief' is an element of the defense of self-defense. To the degree that defendant's belief that he

needed to defend himself depended on [the complainant's] character, that character was placed 'in issue.' *See State v. Montez*, 309 Or 564, 611, 789 P2d 1352 (1990). The incident when [the complainant] hit defendant three times with her cast, knocking him to the floor, was probative of the conduct against which defendant would have reasonably believed it necessary to protect himself. It was error to exclude defendant's testimony of the specific incident."[19] *Id.* at 435-36 (citation omitted; footnote omitted).

The same reasoning fully supports the trial court's ruling here. Biggs' alleged propensity was not an essential element of the self-defense claim. Defendant's "reasonable belief" was. *See* ORS 161.209. However, evidence of prior specific incidents of which defendant had no knowledge could not relate to "reasonable belief." Accordingly, the evidence was not admissible under OEC 404(1).[20]

We turn, then, to defendant's first assignment of error. In that assignment, defendant asserts that the trial court erred in admitting, as part of the state's case-in-chief, evidence of specific instances of defendant's violent conduct toward a former spouse and a former boyfriend. That evidence, as challenged on appeal, pertained to four episodes:

(1)   In the late 1980s, defendant attempted to hit her third husband, Charles Sears, with a board or stick the size of a 2x4.

(2)   In 1989, after she divorced Sears, she asked her then-boyfriend, David Ingram, to burn down Sears' barn, apparently in retaliation for not having received any of Sears' property in the divorce.

---

[19] Professor Kirkpatrick takes issue with *Lunow*'s analysis but not with its result:

"Although the court reached the right result, a preferred ground of decision would be that OEC 404 does not regulate this type of evidence at all. OEC 404 does not address all possible uses of 'character' evidence. Evidence of a victim's prior acts of violence, provided they are known to the defendant, have long been admissible to show the defendant's reasonable belief in the need to use self-defense." Laird C. Kirkpatrick, *Oregon Evidence*, 28 (2d ed Supp 1995).

[20] Although defendant argued to the trial court that the evidence was, alternatively, admissible under OEC 404(2)(b), she does not renew that argument on appeal.

    (3)    While defendant was living with Ingram, she once threw a 16 ounce can of spray paint at Ingram's head, and he suffered a permanent scar on his hand in shielding himself.

    (4)    In late 1989, after Ingram forced her to leave his mobile home, defendant went to the mobile home, while Ingram was in jail, broke a window to gain access, spilled bleach and blackberry wine on the carpet, broke a lamp, a mirror, a television screen, and a typewriter, put broken glass in a milk jug that still had milk in it, stuffed a towel down the toilet, sprayed tooth paste and shaving cream all over the bathroom, and took several items that allegedly did not belong to her.

Defendant argues that some or all of those instances were not admissible under OEC 404(3) under the standard announced in *State v. Johns*, 301 Or 535, 725 P2d 312 (1986), and that that error requires reversal.[21]

The trial court considered the admissibility of those incidents, along with evidence of approximately 10 others. While excluding the others, the court concluded that the Sears and Ingram episodes were sufficiently similar and relevant to the conduct charged here that they satisfied *Johns'* requirements. We conclude that the court erred in admitting the evidence but that that error was harmless.

In determining the admissibility of prior acts evidence as proof of criminal intent under OEC 404(3), the trial court must engage in a two-step inquiry. First, the court must determine whether the proffered evidence is relevant to the issue of intent, by reference to five considerations:

"(1)   Does the present charged act require proof of intent?

"(2)   Did the prior act require intent?

"(3)   Was the victim in the prior act the same victim or in the same class as the victim in the present case?

---

[21] At trial, defendant also contested the admission of testimony by Grissom, the painter, that he had heard defendant assault Biggs. 147 Or App at 512. She does not renew that argument on appeal.

"(4)   Was the type of prior act the same or similar to the acts involved in the charged crime?

"(5)   Were the physical elements of the prior act and the present act similar?" *Johns*, 301 Or at 555-56.

Those five conditions are conjunctive; if any condition is not met, the evidence must be excluded. *State v. Pratt*, 309 Or 205, 211, 785 P2d 350 (1986). If, but only if, "the answer to *each* of these questions is yes," *id.* (emphasis supplied), does the court proceed to the second inquiry:

"[I]s the probative value of the prior act evidence substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury, undue delay or presentation of cumulative evidence?" *Johns*, 301 Or at 556.

The state, as the proponent of the Sears and Ingram evidence, had the burden of demonstrating admissibility under the *Johns* test. *Pratt*, 309 Or at 210.

■      Here, the state failed to demonstrate that those episodes satisfied each of *Johns*' five cumulative conditions of relevance. In particular, at least two of the incidents—the alleged attempt to burn Sears' barn and the "trashing" of Ingram's trailer—did not meet *Johns*' fourth ("type of act") requirement. The other two, *i.e.*, the attempt to hit Sears with a 2x4 and hitting Ingram with a spray paint can, did not comport with the fifth (similarity of "physical elements") condition.

For *Johns*' "type of act" purposes, the crime charged here, murder by firearm, is most broadly described as a "person" crime. More particularly, for comparative purposes, it involves the use of a lethal weapon in inflicting grievous physical injury. In contrast, the alleged barn-burning conspiracy and the vandalism at Ingram's trailer were, at base, "property" crimes. With the possible exception of leaving glass in Ingram's milk jug—conduct that the state did not attempt to present to the jury separately from the other acts of vandalism[22]—none of defendant's alleged conduct in those

---

[22] In all events, the physical elements with respect to the glass in the milk jug were so different from those pertaining to Biggs' murder that, even if separately offered, the milk jug prior act would not have met *Johns*' fifth requirement.

two episodes involved assaultive behavior, much less the use of deadly physical force. Accordingly, those episodes did not satisfy *Johns'* fourth requirement and should have been excluded.

■■ In applying *Johns'* fifth requirement, the court must consider, and compare, both the physical similarities and the physical dissimilarities of the present and prior incidents. *Pratt*, 309 Or at 214; *State v. Rinkin*, 141 Or App 355, 369, 917 P2d 1035 (1996). With respect to the Sears 2x4 incident, the record of the circumstances of that incident is so minimal as to preclude any meaningful comparison: Sears testified that defendant became violent only once during their six-year marriage. On that occasion, shortly after the parties separated, defendant picked up a stick about the size of a 2x4 with the apparent intent of hitting Sears, but Sears grabbed it and took it away. Sears could not recall what, if anything, may have made defendant angry.

From that account, the only apparent physical similarities between the 2x4 incident and Biggs' killing are that, in each instance, defendant assaulted (or attempted to assault) a husband from whom she was separated. The dissimilarities of the physical elements are manifest: There was no history of domestic violence between defendant and Sears; there was no apparent explanation, including any ostensible financial motivation or claim of self-defense or emotional disturbance, in the Sears incident; there was no evidence that defendant ever spoke of killing Sears, as she did Biggs; one incident involved attempted use of a stick or board, the other involved actual use of an assault rifle. Given the preponderance of material dissimilarities, the trial court erred in admitting evidence of the 2x4 incident.

■ Our assessment of the Ingram spray paint can incident is similar. Ingram, defendant's former boyfriend, testified that defendant became angry only once during their relationship. On that occasion, the two had an argument over defendant's dissatisfaction with Ingram's trailer, where they were living. Defendant ran screaming into the trailer and, when Ingram followed her, she threw a 16-ounce can of spray paint at him; he threw up his hands to avoid being hit in the head and suffered a permanent scar on one hand. When

Ingram asked defendant why she attacked him, she replied, "I would have killed you if I could."

Although defendant's "I would have killed you" statement makes the question somewhat closer than with respect to the 2x4 incident, the material dissimilarities of the physical elements of the spray can incident again outweigh the similarities *vis-a-vis* the Biggs' shooting. Again, there was no apparent prior domestic violence between Ingram and defendant, no prior threats of violence, no ostensible economic motivation for the attack, no claim of self-defense, no use of a firearm. As with the 2x4 incident, the spray paint can incident showed that defendant had a hair-trigger temper and that, when angry, she would lash out physically. "As a *practical* matter," both incidents were undeniably probative of a propensity towards violence. *Rinkin*, 141 Or App at 370 (emphasis in original). "But *Johns* and *Pratt* require more *as a matter of law*." *Id*. (emphasis in original). Accordingly, the trial court erred in admitting evidence of the Sears and Ingram incidents during the state's case-in-chief.

■ We conclude, however, that that error was harmless. That is, we are persuaded that there is "substantial and convincing evidence of guilt" and that there is "little likelihood that the error affected the verdict." *State v. Hansen*, 304 Or 169, 180, 743 P2d 157 (1987). Our holding rests on an exhaustive review of the record and on our particularized assessment of the likely impact of the erroneously admitted evidence on the jury's consideration of defendant's claims and defenses.

Before specifically addressing those claims and defenses, two overarching considerations bearing on potential prejudice must be emphasized. First, the state's evidence—and especially its forensic evidence—was not just substantial, but overwhelming.

Second, other substantial evidence of, and references to, defendant's violent and aggressive conduct towards Biggs and others were, in all events, properly before the jury. The testimony by the painter, Grissom, the evidence pertaining to the June 1993 glass-throwing incident, and the testimony relating defendant's musings about killing Biggs are three prominent examples. Moreover, on cross-examination

of defendant's psychiatric and psychological experts, the prosecutor inquired, without objection, as to whether those witnesses had been aware of the attempted assault on Sears, the solicitation to torch Sears' barn, the vandalism of Ingram's trailer, and the paint can assault. Defendant does not suggest on appeal that that inquiry, going to the bases of the experts' opinions that defendant was the victim of abuse who was suffering from post-traumatic stress syndrome, was improper cross-examination.

Returning to defendant's particular defenses, we conclude that there was little likelihood that the erroneous admission of the Ingram and Sears incidents evidence affected the jurors' consideration of defendant's insanity defense. That determination rests not only on the two general considerations described above but also, more particularly, on the weakness of defendant's evidence with respect to insanity. As noted, defendant's own psychiatrist, Luther, testified before trial that, as of April 1, 1994, defendant did not have any mental disorder sufficient to support an insanity defense. Moreover, on cross-examination at trial, Luther conceded, "I'm not going to say that she was unable to understand the criminality of her behavior." He further conceded, "I'm not prepared to say that [she] was total[ly] unable to conform, no." Conversely, the state's two experts, Sasser and Brill, testified unequivocally that defendant did not have a mental disease or defect and that she had a substantial capacity to appreciate the criminality of her conduct and to conform to the requirements of the law.

For similar reasons, the error was harmless with respect to defendant's "lack of intent" defense. Luther, defendant's expert, acknowledged at trial that, "I think, that to a large extent, she can form the intent. But that is colored somewhat by her pathology." Again, the state's experts were unequivocal that defendant was capable of forming the requisite intent to kill. Moreover, defendant's own undisputed conduct immediately surrounding the shooting belies any inability to form intent. Particularly pertinent are defendant's actions in making the "take care of my babies" call before the shooting and in removing and sanitizing evidence (the vacuum cleaner) and washing her hands and face before calling 9-1-1 after the shooting.

■     Our determination that the error was harmless with respect to the jury's consideration of self-defense flows principally from our assessment of the strength of the state's evidence contradicting that defense. As we have noted, that evidence—and particularly the forensic evidence described at length above, 147 Or App at 520—was overwhelming.

That evidence demonstrated that, far from firing at Biggs in self-defense as he advanced with a knife, defendant shot him as he stood at the base of the stairway, wounded him, advanced on him, wounding him further, and then shot him several times in the head with a semi-automatic rifle at very close range. The forensic evidence further demonstrated that the knife was planted immediately after the killing and strongly suggested that the hair found in Biggs' hand was also planted and that defendant's bruises were either self-inflicted or self-exacerbated. Beyond the forensic evidence, the state presented testimony of several neutral witnesses who described defendant's violent and aggressive conduct toward Biggs and defendant's musings about killing Biggs. Given the totality of the evidence, any possible, incremental "poisoning the well" prejudice from the jury hearing about the Sears and Ingram episodes during the state's case-in-chief was, at most, minimal.[23]

■     Finally, for related reasons, the error was harmless *vis-a-vis* the extreme emotional disturbance defense. The trial court, without objection, gave the uniform instruction on that defense, UCrJI 1307, which provides, in pertinent part:

"To establish the defense of an extreme emotional disturbance the defendant must prove, by a preponderance of the evidence * * *:

"(1)   If the defendant committed an intentional homicide she was acting under an extreme emotional disturbance. This means that the defendant was under the influence of an emotional disturbance to the extent that she lost the capacity to control herself and forgo the homicide.

---

[23] That is especially so given that the jury, as noted, heard references to many aspects of the Sears and Ingram incidents during the state's cross-examination of defendant's psychiatric and psychological experts. *See* 147 Or App at 532-33. Again, defendant does not suggest on appeal that such questions were inappropriate on cross-examination in the light of defendant's "battered woman" defense.

This could be brought on by either a sudden provocation or other events that aroused extreme mental or emotional disturbance."

To the extent that we can discern, defendant's extreme emotional disturbance defense depended on the premise that the "sudden provocation" of Biggs' assault triggered the requisite mental or emotional disturbance. As noted, the overwhelming physical evidence contradicts that premise. We observe, moreover, that the defense did not emphasize the extreme emotional disturbance defense and, in closing argument, referred to that defense only parenthetically, without relating the evidence to its specific requirements. Given those circumstances, as well as the two general considerations described above, we conclude that there was little, if any, likelihood that the erroneously admitted evidence affected the jury's assessment of the extreme emotional disturbance defense.

■ Defendant's third assignment of error challenges the court's refusal to give a requested instruction concerning Biggs' alleged propensity for violence. We agree with the state that the instruction embodied an impermissible comment on the evidence. Thus, the trial court correctly declined to give it.

Affirmed.